No. 15-3189

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

**Grace Lee,**
Plaintiff-Appellant,

vs.

**Dr. James A. Guikema and Dr. James W. Neill,**
Defendants-Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS
JULIE A. ROBINSON, DISTRICT JUDGE CASE NO. 12-2638

## APPELLANT'S OPENING BRIEF

(Oral Argument Desired)

**Grace Lee, Pro Se.**
198 Mount Vernon St. S1
Malden, Massachusetts, 02148

November 3, 2015

# CORPORATE DISCLOSURE STATEMENT

(Not Applicable)

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... I

TABLE OF AUTHORITIES .................................................................................................. III

STATEMENT OF RELATED CASES..................................................................................... V

STATEMENT OF JURISDICTION........................................................................................ VI

STATEMENT OF THE ISSUES.......................................................................................... VIII

STATEMENT OF THE CASE................................................................................................ IX

STANDARDS OF REVIEW.................................................................................................. XV

STATEMENT OF THE FACTS ............................................................................................... 1

SUMMARY OF ARGUMENT................................................................................................ 21

ARGUMENT............................................................................................................................ 22

I.      ISSUE NO. 1:  DID THE DISTRICT COURT ERR IN FINDING THAT
        MS. GRACE LEE'S EVIDENCE AS TO HER DISMISSAL DID NOT
        RAISE A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER
        THE DISMISSAL WAS MOTIVATED BY FACTORS UNRELATED TO
        HER ACADEMIC PERFORMANCE?............................................................................ 22

        A.The vote on Plaintiff Lee's dismissal was based on unfounded disciplinary
            accusations against her........................................................................................... 23

        B.There was no contemporaneous document in support of Defendants'
            allegation that Plaintiff Lee's academic performance was subpar;
            evidence shows Plaintiff's academic performance was excellent ..................... 28

        C.Even the Surface Reason "Failure to Find a Major Advisor" that
            Defendants Alleged for Plaintiff's Dismissal was Also Nonacademic............. 30

II.     ISSUE NO. 2:  DID THE DISTRICT COURT ERR IN FINDING THAT
        MS. GRACE LEE'S EVIDENCE AS TO HER DISMISSAL PROCESS DID
        NOT RAISE A GENUINE ISSUE OF MATERIAL FACT AS TO
        WHETHER SHE WAS PROVIDED THE DUE PROCESS REQUIRED BY
        THE NATURE OF HER DISMISSAL?............................................................................ 32

A.Plaintiff Lee was neither notified of the charges against her, nor given an
    opportunity to rebut the accusations regarding her behaviors, based
    on which the SPC cast their votes to dismiss her ..................................................33

B.Defendants didn't properly inform Plaintiff Lee of the consequence of
    temporary lack of a major professor; many graduate students had no
    major professor for much longer time than Plaintiff ........................................36

C.The failure of Plaintiff's appeal for reinstatement was not by any error on
    Plaintiff's side. ........................................................................................................40

**CONCLUSION** ............................................................................................................44

**STATEMENT AS TO ORAL ARGUMENT** ............................................................44

## TABLE OF AUTHORITIES

### Cases

Pitman v. Blue Cross & Blue Shield of Okla.,
  217 F.3d 1291 (10th Cir. 2000) ..................................................................... xiv
Anderson v. Liberty Lobby, Inc.,
  477 U.S. 33 242 (1986) ................................................................................. xiv
Fischer Imaging Corp. v. Gen. Elec. Co.,
  187 F.3d 1165 (10th Cir. 1999) ..................................................................... xiv
Regents of University of Michigan v. Ewing,
  474 U.S. 214 (1985) ............................................................................ 22, 38, 39
Board of Curators of Univ. of Missouri v. Horowitz,
  435 U.S. 78 (1978) .......................................................................... 22,27,36,37
Goss v. Lopez,
  419 U.S. 565 (1975) ....................................................................... 23,32,33,34
Gossett v. Oklahoma ex rel. Board of Regents for Langston Univ.,
  245 F.3d 1172 (10th Cir. 2001) ....................................................................... 23
Assenov v. University of Utah,
  553 F. Supp. 2d 1319 (D. Utah 2008) ....................................................... 31, 41
Gorman v. University of Rhode Island,
  837 F.2d at 12 (1st Cir. 1988) ......................................................................... 33
Roach v. Univ. of Utah,
  968 F. Supp. 1446 (D. Utah 1997) ................................................................. 33
Carboni v. Meldrum,
  949 F. Supp. 427 (W.D. Va. 1996) ................................................................. 33
Aubuchon v. Olsen,
  467 F. Supp. 568, 573 (E.D. Mo. 1979) ......................................................... 33
Dixon v. Alabama State Board of Education,
  294 F.2d at 158 (5th Cir. 1961). ..................................................................... 35
Patsy v. Florida Board of Regents,
  457 U.S. 496 (1982) ........................................................................................ 40
Hopkins v. Okla. Pub. Employees Retirement Sys.,
  150 F.3d 1155 (10th Cir. 1998) ....................................................................... 40
Kirkland v. St. Vrain School District,
  464 F.3d 1182 (10th Cir. 2006) .................................................................. 40,41

**Statutes**

42 U.S.C. section 1983 .......................................................................... vi, xiii, 23, 40

**Rules and Regulations**

Fed. R. Civ. P. 56(c)...................................................................................................xiv

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## STATEMENT OF JURISDICTION

A.    BASIS FOR THE DISTRICT COURT'S SUBJECT-MATTER
JURISDICTION.

Ms. Grace Lee filed the civil action at issue under the laws of the United
States. She alleged that Kansas State University officials Dr. James W. Neill and
Dr. James A. Guikema violated her rights under 42 U.S.C. Section 1983. Thus, the
District Court had jurisdiction of the claims pursuant to federal question, 28 U.S.C.
§ 1331.

B.    BASIS FOR THE COURT OF APPEALS' JURISDICTION.

The instant appeal is an appeal from a final decision of a U.S. District Court.
The Court of Appeals has jurisdiction over this appeal pursuant to 28 U.S.C. §
1291.

C.    FILING DATES ESTABLISHING THE TIMELINESS OFTHE
APPEAL.

July 23, 2015    Court Order on Defendant's Motion for Summary Judgment

Aug. 18, 2015    Filed Notice of Appeal

Sep. 29, 2015 Filed Unopposed Motion for Extension of Time to File
Opening Brief

vi

Oct. 2, 2015    Motion for Extension of Time was granted on the Clerk's authority

D.    INFORMATION ESTABLISHING THE COURT OF APPEALS' JURISDICTION.

This is an appeal from a final order of the District Court, issued on July 23, 2015, which disposed of all claims of all parties.

## STATEMENT OF THE ISSUES

This appeal presents the following two issues:

1. Did the District Court err in finding that Ms. Grace Lee's evidence as to her dismissal did not raise a genuine issue of material fact as to whether the dismissal was motivated by factors unrelated to her academic performance?

2. Did the District Court err in finding that Ms. Grace Lee's evidence as to her dismissal process did not raise a genuine issue of material fact as to whether she was provided the due process required by the nature of her dismissal?

## STATEMENT OF THE CASE

### Factual Background

Plaintiff Grace Lee ("Plaintiff Lee") had been enrolled in the doctoral program in the Department of Statistics in Kansas State University (KSU) since the spring semester of 2006. At the time of her dismissal in May, 2012, she carried an overall GPA 3.95 and Ph.D. GPA 4.0. During her six years' doctoral tenure, she passed "Ph.D. Qualifying Exam", received several academic scholarships, published several peer-reviewed papers and completed a 225 pages dissertation proposal. On January 30, 2012, merely three month prior to her dismissal, the Department of Statistics confirmed that Plaintiff Lee was on schedule to graduate with her Ph.D. in Statistics in the spring of 2013. Department Head James W. Neill ("Defendant Neill") explicitly stated in writing that Plaintiff was "making satisfactory academic progress" and that "a promising amount of technical work accomplished" by her.

On March 18, 2012, Plaintiff Lee initiated a grievance against her major professor (advisor) Dr. Haiyan Wang ("Dr. Wang") regarding her abusive and unprofessional behavior toward Plaintiff Lee. Without affording Plaintiff a hearing that is required by KSU Graduate School grievance policies, Plaintiff Lee's grievance was approved and Dr. Wang was removed from her role as Plaintiff

ix

Lee's major professor. Despite Plaintiff Lee's repeated entreaties, Defendant Neill,
who was also Plaintiff's major professor, removed himself as Plaintiff Lee's major
professor, leaving Plaintiff Lee without a major professor since April 9, 2012.
During the following weeks, Grace Lee diligently contacted in writing and in
person the faculty members within the Department of Statistics, inviting them to be
her major advisor.  On April 19, 2012, Defendant Neill informed Plaintiff Lee that
her Graduate Teaching Assistant (GTA) position was in jeopardy if she could not
locate a replacement major professor by April 27, 2012. Plaintiff Lee's efforts in
locating a major professor were met with no immediate success, due to the
extremely truncated arbitrary timeframe set by Defendant Neill, and Defendant
Neill's insisting that only tenured faculty members should consider becoming
Plaintiff's major advisor. When the April 27, 2012 deadline expired, Plaintiff Lee
was terminated of her summer Graduate Teaching Assistantship, despite being the
most senior GTA in the Department of Statistics and having maintained continuous
and successful employment as a GTA for the prior six years. On April 28, 2012,
Plaintiff Lee complained with the Graduate School that her GTA was terminated
and that she was retaliated by Defendant Neill for filling the grievances against Dr.
Wang.

On May 2, 2012, "there was an incident in which Grace Lee was reported to
be yelling and disruptive in the Graduate School office", according to Associate

Dean of Student Life Ms. Heather Reed's ("Ms. Reed") Declaration [1]. On May 3,

2012, Defendant Neill wrote all faculty members in the Department of Statistics,

stating KSU administration was to terminate Plaintiff Lee from the program due to

her "self-destructive" behavior that "has the potential to extend to others" and that

"university police and lawyer(s)" had been involved in the discipline proceeding.

On May 4, 2012, "A CIRT [Critical Incident Response Team] was called and the

team met." "The purpose of the meeting was to discuss the incident and to develop

an action plan." On May 4, 2012, Ms. Reed sent a terse email to Plaintiff Lee

mandating a meeting with her. On May 7, 2012, Graduate School Associate Dean

Dr. Guikema ("Defendant Guikema") and Ms. Reed held the "mandatory" meeting

with Plaintiff Lee, which was the only meeting that KSU officials held with

Plaintiff throughout the process of Plaintiff's dismissal. In the meeting, Defendant

Guikema told Plaintiff Lee that the department of statistics would soon recommend

to the graduate school that she be dismissed due to her lack of linkage with a major

professor. Neither Defendant Guikema nor Ms. Reed spoke to Plaintiff Lee

regarding the alleged May 2, 2012 yelling and screaming incident in the Graduate

School, or her alleged "erratic, aggressive", "self-destructive" behaviors that "has

---

[1] Ms. Reed does not provide a witness, or the report of the alleged May 2, 2012 incident.
Contrary to Ms. Reed's Declaration, in Plaintiff's surreply, Plaintiff Lee declares under penalty
of perjury that she did not visit the Graduate School on May 2, 2012. (Doc 77-2, Second
Declaration of Grace Lee, ¶ 4). In addition, Plaintiff declares under penalty of perjury that she
has never yelled, screamed or been disruptive on KSU campus or in any KSU Graduate School
office. (Doc 77-2, Second Declaration of Grace Lee, ¶ 5).

the potential to extend to other", or the May 4, 2012 CIRT meeting against her. However, Defendant Guikema and Ms. Reed asked Plaintiff Lee not to contact the department of statistics and the graduate school.

On May 8, 2012, Defendant Neill wrote Student Progress Committee ("SPC") in the department of statistics, stating that the May 4, 2012 CIRT meeting with Ms. Reed, the graduate school, university lawyers, police, etc. led to the May 7, 2012 meeting, in which Plaintiff Lee was informed that her options in the department of statistics was zero. In addition, he stated he had obtained permission from the Graduate School to formally request that Grace be terminated from the program based on her behavior, and he would like to submit the request as soon as possible.

Without being given an opportunity to hold a meeting to discuss about the dismissal decision, or an opportunity to verify Defendant Neill's accusations against Plaintiff Lee, the SPC voted by email. Two SPC members abstained and the other two members voted in support of the dismissal. Chair of the SPC Dr. Higgins wrote: "Grace's behavior has led to this unfortunate situation." On May 9, 2012, Defendant Neill authored the departmental dismissal letter stating that Plaintiff Lee's dismissal was "based on her failure to find a replacement major professor". On May 31, 2012, Defendant Guikema authored the graduate school dismissal letter stating that the reason for Plaintiff's dismissal was "failure to make satisfactory progress".

**Procedural History**

On September 28, 2012, Plaintiff Grace Lee filed a ten-count complaint (Doc. 1) against Kansas State University ("KSU"), Dr. Carol W. Shanklin, Dr. James A. Guikema, Dr. Duane W.Crawford, Dr. James W. Neill, Dr. Haiyan Wang, and Ms. Heather Reed (Defendants). Defendants filed a motion to dismiss on Nov. 16, 2012 (Doc. 12). On Dec. 11, 2012, Plaintiff Lee filed Response to Motion to Dismiss, in which she conceded that her claims against KSU and against the other defendants in their official capacities are barred by their Eleventh Amendment immunity (Doc. 19 at Page 10). On June 7, 2013, the District Court granted in part and denied in part Defendants' Motion to Dismiss (Doc. 21). The District Court dismissed all claims in the Complaint except for portion of Count I, alleging violation of procedural due process pursuant to 42 U.S.C. § 1983 in Defendants' individual capacities. Subsequently, two-month limited discovery was conducted from Dec. 20, 2013 to Feb. 20, 2014 (Doc. 26). On Dec. 19, 2013, the day before the start of the limited discovery, Defendants filed a Motion to Dismiss Parties as to Defendants Ms. Heather Reed, Dr. Carol W. Shanklin, Dr. Duane Crawford and Dr. Haiyan Wang (Doc. 30). On August 20, 2014, the District Court granted the Motion to Dismiss Parties, leaving Dr. James A. Guikema and Dr. James W. Neill as the two remaining defendants (Doc. 58).

On Dec. 5, 2014, Defendant Guikema and Defendant Neill filed a Motion for Summary Judgment (Doc. 67). On Jan. 9, 2015, Plaintiff Lee filed Response to Defendants' Motion for Summary Judgment (Doc.71). On Feb. 6, 2015, Defendants filed their Reply to Plaintiff's Response to Motion for Summary Judgment (Doc. 76). On Feb. 19, 2015, Plaintiff filed a Surreply Memorandum and Motion for Leave to File Surreply (Doc. 77). On Feb. 27, 2015, Defendants filed Response in Opposition to Plaintiff's Motion for Leave to File Surreply and Motion to Strike Surreply(Doc. 78). On March 6, 2015, Plaintiff filed Response to Defendants' Motion to Strike Surreply and Reply to Defendants' Opposition to Plaintiff's Motion for Leave to File Surreply (Doc. 79).

On July 23, 2015, the District Court granted the Motion for Summary Judgment against Plaintiff Grace Lee (Doc. 81). In the same order, the District Court granted Plaintiff's Motion for Leave to File a Surreply Memorandum and rejected Defendants' Motion to Strike (Doc. 81).

On Aug. 18, 2015, Plaintiff Grace Lee filed Notice of Appeal (Doc. 83). On Sep. 29, 2015, Plaintiff-Appellant Grace Lee filed Unopposed Motion for Extension of Time to File Opening Brief. On Oct. 2, 2015, the Motion for Extension of Time was granted on the Clerk's authority and the deadline to file the opening brief was extended to Nov. 4, 2015.

## STANDARDS OF REVIEW

1. "Summary judgment orders are reviewed de novo, using the same standards as applied by the district court."[2] Summary judgment is appropriate only if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[3] "The movant has the burden of showing that there is no genuine issue of fact . . ."[4] The non-moving party "need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial."[5]. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."[6]

2. This court reviews de novo an order denying a party's right to a jury trial under the Seventh Amendment[7].

---

[2] Pitman v. Blue Cross & Blue Shield of Okla., 217 F.3d 1291, 1295 (10th Cir. 2000).

[3] Fed. R. Civ. P. 56(c)

[4] Anderson v. Liberty Lobby, Inc., 477 U.S. 33 242, 256 (1986).

[5] Id. at 256-57

[6] Id. at 255

[7] Fischer Imaging Corp. v. Gen. Elec. Co., 187 F.3d 1165, 1168 (10th Cir. 1999)

## STATEMENT OF THE FACTS

1. Plaintiff Grace Lee ("Plaintiff Lee") had been enrolled in the doctoral program in the Department of Statistics in Kansas State University (KSU) since the spring academic semester of 2006. (Doc. 73, Plaintiff's Declaration, at ¶ 2)

2. Plaintiff Lee carried an overall GPA 3.95 and Ph.D. GPA 4.0 at the time of her dismissal in May, 2012. (Doc. 72-2 pg. 2, Plaintiff's Exhibit 2, academic transcript at KSU)

3. Plaintiff Lee had passed several important milestones in pursuit of her Ph.D. in Statistics from KSU, including passing an important and required "Ph.D. Qualifying Exam" in early 2008. (Doc. 24, Defendants' Answer to Complaint at ¶ 12).

4. Plaintiff Lee was selected by the faculty of the KSU Department of Statistics to be awarded several academic scholarships, due to her excellent academic performance. (Doc. 72-2 pg. 4-5, Plaintiff's Exhibit 3 and 4, scholarship award letters from KSU).

5. Plaintiff Lee completed a 225 pages dissertation proposal (Doc. 73, Plaintiff's Declaration, at ¶ 4).

6. Plaintiff Lee published six peer-reviewed papers based on her work during her Ph.D. tenure. (Doc. 72-2 pg. 6, Plaintiff's Exhibit 5, Plaintiff's resume).

1

7. The Department of Statistics confirmed on January 30, 2012 that Plaintiff Lee
   was on schedule to graduate with her Ph.D. in Statistics in the spring of 2013.
   On January 30, 2012, Department Head James W. Neill ("Defendant Neill")
   explicitly stated in writing that Plaintiff Lee was "making satisfactory academic
   progress" and that "a promising amount of technical work accomplished" by
   her. (Doc. 72-2 pg. 8, Plaintiff's Exhibit 6).

8. On July 26, 2011, Plaintiff Lee complained with Defendant Neill regarding her
   major advisor, Dr. Haiyan Wang's ("Dr. Wang") abusive and unprofessional
   behavior toward Plaintiff Lee (Doc. 72-2 pg. 9, Plaintiff's Exhibit 7).

9. Among the instances of Dr. Wang's inappropriate and abusive behavior
   directed toward Plaintiff Lee are several notable instances. (Doc. 1, Plaintiff's
   Complaint, at Page 7, ¶ 31).

10. First, in August 2009, upon noticing that Plaintiff Lee was wearing a cross
    necklace, Dr. Wang began mocking Plaintiff Lee's faith. Upon Plaintiff Lee's
    comment that she had seen God when she was four years old, Dr. Wang stated,
    "What you saw was not God, it was the Devil." (Doc. 1, Plaintiff's Complaint,
    at Page 7, ¶ 32-33).

11. Second, in May 2011, Dr. Wang told Plaintiff Lee, "The shampoo of your hair
    stinks. It makes me want to vomit." (Doc. 1, Plaintiff's Complaint, at Page 7, ¶
    34).

2

12. Third, Dr. Wang did not credit Plaintiff Lee as a coauthor of an academic paper published in Dr. Wang's name, notwithstanding Plaintiff Lee's extensive eight month-long effort in assisting Dr. Wang with the research featured in the paper. There was no employment relationship between Plaintiff and Dr. Wang. (Doc. 1, Plaintiff's Complaint, at Page 7, ¶ 35-36).

13. Fourth, Dr. Wang never read the main body of Plaintiff Lee's doctoral dissertation proposal, nor did Dr. Wang ever revise the proposal, notwithstanding the fact that Dr. Wang was serving as Plaintiff Lee's major professor and Plaintiff Lee's doctoral dissertation proposal was submitted to her as early as winter 2010. (Doc. 1, Plaintiff's Complaint, at Page 8, ¶ 37).

14. Fifth, Dr. Wang rejected Plaintiff Lee's repeated requests to take the preliminary exam. (Doc. 1, Plaintiff's Complaint, at Page 8, ¶ 38).

15. Sixth, Plaintiff discovered that Dr. Wang allowed one of her former Ph.D. students to graduate with a fraudulent Ph.D. dissertation (Doc. 73, Plaintiff's declaration, ¶ 20)

16. In the meeting on August 29, 2011, Department Head Neill told Plaintiff Lee, "It [Plaintiff's complaint] is too much information for me", "you need to separate the academic and abuse." and: "Dr. Wang told me that she did not abuse you on purpose." No further action was taken by Defendant Neill regarding Plaintiff's complaint. (Doc. 73, Plaintiff's Declaration, at ¶ 23).

3

17. On October 4, 2011, Plaintiff Lee filed a grievance with Graduate School Associate Dean Dr. Guikema ("Defendant Guikema") against Dr. Wang (Doc. 72-3, pg 2, Plaintiff's Exhibits 12).

18. Plaintiff Lee's grievance requested the removal of Dr. Wang from her "supervisory committee" (Doc. 72-3, pg 2, Plaintiff's Exhibits 12).

19. Following the filing of Plaintiff Lee's grievance, no hearing was held with respect to her grievance, despite that such a hearing is required by KSU Graduate School grievance policies (Doc 68-2, KSU Graduate Handbook 2012-2013, page A-4, Section 4).

20. Without affording Plaintiff Lee a hearing, Defendant Guikema placed her grievance in the hands of Interim Dean of the KSU College of Arts and Sciences Dr. Joseph Aistrup, who suggested a purported compromise "solution". (Doc. 1, Plaintiff's Complaint, at Page 8, ¶ 41)

21. The "compromise" consisted of the October 20, 2011 placement of Defendant Neill in a "co-major professor" role alongside Dr. Wang. (Doc. 1, Plaintiff's Complaint, at Page 8, ¶ 42)

22. Following the purported "solution," Dr. Wang's abusive and unprofessional behavior directed toward Plaintiff Lee continued unabated for several months, despite the presence of Defendant Neill as Plaintiff Lee's co-major professor. (Doc. 1, Plaintiff's Complaint, at Page 8, ¶ 43).

4

23. Following consultation with Associate Dean of the Graduate School Dr. Duane W. Crawford, Jr. ("Dr. Crawford") regarding Dr. Wang's continuing abusive behavior, and upon Dr. Crawford's advice (Doc. 24, Defendants' Answer to Complaint, at ¶ 20), on March 18, 2012, Plaintiff Lee initiated another grievance against Dr. Wang (Doc. 68-9, grievance letter and notice).

24. On March 26, 2012, Defendant Neill wrote Dr. Crawford: "I have absolutely no interest in a grievance proceeding in which Grace will in all likelihood simply repeat the railings that all have heard (repeatedly in some cases) with the objective of removing Dr. Wang from her committee...I would further say that I am not interested in signing a further extension of Grace's I-20 (if given the opportunity) i.e. she would need to finish by next end of next spring. Additionally, I am not interested in supporting Grace next year." (Doc 72-3, pg 26, Plaintiff's Exhibit 19).

25. Once again, the administration of the KSU Graduate School and the Department of Statistics, including Defendants Neill and Guikema, disregarded the grievance procedures set forth in the Graduate Handbook and proceeded without holding a hearing on Plaintiff Lee's grievance (Doc. 73, Plaintiff's Declaration, at ¶ 24).

26. On or about April 4, 2012, Plaintiff Lee's grievance was approved without the required hearing and Dr. Wang was removed from her role as Plaintiff Lee's major professor and from Plaintiff Lee's supervisory committee. (Doc. 68-10)

27. Despite Plaintiff Lee's repeated entreaties, Defendant Neill removed himself as Plaintiff Lee's major professor on or about April 9, 2012, leaving Plaintiff Lee without a major professor. (Doc 72-2, pg. 10, Plaintiff's Exhibits 8; Doc 72-3, pg. 29, Plaintiff's Exhibits 20)

28. After Defendant Neill abandoned his duty as Plaintiff Lee's major professor, Plaintiff Lee sent emails and follow-up emails to all twelve of the other faculty members within the Department of Statistics, inviting them to be Plaintiff's major professor. (Doc. 72-4, pg. 4-28, Plaintiff's Exhibit 23)

29. Faculty members' replies are quoted below:

Dr. Yao: "I feel very sorry for your situation. However, I am afraid I won't be able to advise your Ph.D. work. If It were two years ago, I would be very happy to advise you since you are very good student in my Stat 981 class. However, now I have six students, four of them are Ph.D. students. In addition, this year, I need to prepare my tenure document. The current burden is already too much for me to handle. Hope you can find somebody else as your major professor. Wish you the best and take care!"

Dr. Du: "Thanks for emailing me! I am very sorry to hear about this and I just talked with Dr. Neill briefly. It looks like he will let me and others know before anything can happen. So I will keep you posted. Talk to you more later!"

Dr. Higgins: "I am sorry things have not worked out between you and Dr. Wang. I will be retiring at the end of June this year. So I will not be able to take any more PhD student. I hope you will be able to find someone to guide you."

Dr. Boyer: "I appreciate the difficulty of your situation, but I am not able to step into this role. Good luck." (Dr. Boyer retired in summer 2012)

Dr. Nelson: "Thanks for your interest in having me serve as your advisor. However, I am in phased retirement, only work part time now and not in a position to take new Ph.D. students."

Dr. Jager: "Unfortunately, I'm only a graduate student member without certificate. This means that I can advise masters students and serve on PhD committees, but I am not able to serve as major professor for a PhD student."

Dr. Bello: "After reading through the grievance letter and browsing through the working draft of your dissertation research, I think I can start to understand the situation, which is, I think, very unfortunate. However, I am afraid I do not have the level of expertise on the specific topic of your PHD research to serve as your major PhD advisor."

Dr. Song: "Would you please stop by my office tomorrow sometime after 10:00?"

(Doc. 72-4, pg. 4-28, Plaintiff's Exhibit 23)

30. Besides sending emails, Plaintiff Lee visited in person with Dr. Juan Du, Dr. Paul Nelson, Dr. Leigh Murray and Dr. Weixing Song, inviting them to serve as her major advisor (Doc. 73, Plaintiff's Declaration, at ¶ 10).

31. On April 16, 2012, Plaintiff visited Dr. Weixing Song at his invitation (Doc. 72-4, pg. 22). Dr. Song told Plaintiff Lee that he had the capability and interest in advising her on her chosen research topic, but he also said he dared not to be Plaintiff's major advisor at that time because he was afraid of the trouble that Department Head Neill and Dr. Wang would cause him. Further, Dr. Song stated that he hoped that Plaintiff ask the Graduate School to straighten things

up before he would consider taking on the major advisor role. (Doc. 73, Plaintiff's Declaration, at ¶ 11).

32. On April 20, 2012, Dr. Higgins sent Department Head Neill an email reporting the result of the April 19, 2012 meeting of Student Progress Committee (SPC) in the department of statistics:

"The student progress committee met Thursday. Attached is a spreadsheet commenting on the progress of our students. With two exceptions being Grace Lee and ████, our students are making adequate progress. A couple of students may have some attitude issues which we've commented on, but this has not affected their progress. Overall I think students are doing better at making progress than was the case a couple of years ago."

(Doc. 68-14)

33. The reason for evaluating Plaintiff Lee to be one of the two "exceptions" was "because the relationship between Grace and her major professor Dr. Wang had gotten so contentious that it was apparently impossible for them to continue to work together", as noted in Dr. Higgins' Declaration[8] (Doc. 68-13, Higgins Declaration, at ¶ 6).

---

[8] As noted in Dr. Higgins' email, a spreadsheet file consists of the SPC's comments on Plaintiff was attached to Dr. Higgins' email (Doc. 68-14, Defendants' Exhibit 3), but Defendants did not provide the spreadsheet. Therefore, Plaintiff has to rely on Dr. Higgins' declaration to describe the SPC' evaluation on her.

34. Neither the SPC's evaluation nor the comment was provided to Plaintiff Lee. (Doc. 73, Plaintiff's Declaration, at ¶ 14).

35. On April 19, 2012, Defendant Neill wrote Plaintiff Lee "I will need to know by April 27 (next Friday) whether you have located another professor (and which professor this is) to supervise your research. It is important that I know this information as Dr. Song (as Graduate Program Director) and I are now deciding on fall GTA [Graduate Teaching Assistantship] appointments". (Doc. 68-11, pg. 2).

36. On April 20, 2012, Plaintiff Lee wrote Defendant Neill: "I have contacted several professors in our department, but no luck so far. I will keep looking and email you if I have any result." (Doc. 68-11 pg.1)

37. On April 23, 2012, Plaintiff Lee reported again to Defendant Neill her efforts in locating a major professor: "I have been contacting professors in our department both by email and in person. However, I can't guarantee that I can find a new advisor by this Friday though I'll try my best. About my GTA appointment, I respect your power in determining GTA appointment; I also hope you could consider factors such as Ph.D. research work progress, GPA, teaching performance." (Doc. 68-11, pg.1).

38. On April 24, 2012, during the faculty meeting of statistics department, Department Head Neill "strongly suggested that only faculty members with

9

tenure should consider becoming her [Plaintiff Lee's] advisor" (Doc. 72-4, pg. 64, Plaintiff's Exhibit 27, faculty meeting minutes, section 'Grace Lee').

39. Less than half of the faculty members in the Department of Statistics were tenured. Among them, three tenured faculty members (Dr. James Higgins, Dr. John Boyers and Dr. Paul Nelson) were retiring within a couple of months as of April to May 2012. Defendant Neill effectively allowed only two faculty members to consider becoming Plaintiff Lee's major advisor. (Doc. 73, Plaintiff's Declaration, at ¶ 6).

40. Many Ph.D. students in the Department of Statistics and in the Graduate School have untenured faculty members as their major professors. No university or department policy indicates that only faculty members with tenure should consider becoming a student's major advisor.    (Doc. 73, Plaintiff's Declaration, at ¶ 7).

41. On or about April 27, 2012, Plaintiff Lee was terminated of her summer Graduate Teaching Assistantship, despite being the most senior GTA in the Department of Statistics and having maintained continuous and successful employment as a GTA for the prior six years (Doc. 73, Plaintiff's Declaration, at ¶ 28).

42. On April 28, 2012, Plaintiff reported to Dr. Crawford that she was denied of the summer GTA by Defendant Neill and claimed it was retaliation against her for filling the grievances against Dr. Wang. (Plaintiff's Exhibit 29).

43. On May 2, 2012, Plaintiff sent an email entitled "Seeking help" to Defendant Guikema and Dr. Crawford: "I know some faculty members are not completely disinclined to be my major advisor but I am just a student with zero influence. If the graduate school could step in to coordinate, I believe the result would be much different." (Doc. 72-4, Plaintiff's Exhibit 30). No assistance was offered.

44. According to Associate Dean of Student Life Ms. Heather Reed's ("Ms. Reed") Declaration, "On May 2, 2012, there was an incident in which Grace Lee was reported to be yelling and disruptive in the Graduate School office." (Doc. 76-3, Reed Declaration, ¶ 7)[9].

45. On May 2, 2012, Defendant Neill and Ms. Reed had "a long conversation" that resulted in Ms. Reed's email to other KSU officials including Defendant Guikema: "I had a long conversation with Jim [Neill] and we think a meeting to plan our response and her [Plaintiff Lee's] separation from the university is

---

[9] The allegation of the May 2, 2012 incident was advanced for the first time in Defendants' Reply to Plaintiff's Response to Motion for Summary Judgment (Doc. 76). Ms. Reed does not provide a witness, or the report of the alleged incident. Plaintiff filed a motion for leave to file surreply (Doc. 77), which was granted by the district court (Doc. 81). In Plaintiff's surreply, she declares under penalty of perjury that she did not visit the Graduate School on May 2, 2012. (Doc. 77-2, Second Declaration of Grace Lee, ¶ 4) In addition, Plaintiff declares under penalty of perjury that she has never yelled, screamed or been disruptive on KSU campus or in any KSU Graduate School office. (Doc. 77-2, Second Declaration of Grace Lee, ¶ 5).

prudent, considering her erratic, aggressive behavior." (Doc. 72-5, pg. 1,

Plaintiff's Exhibit 31)

46. On May 3, 2012, Defendant Neill wrote all faculty members in the Department

of Statistics:

"Heather [Reed] called me yesterday, indicating that Grace had become so upset at the Graduate School that she needed to be escorted from the building. Heather [Reed] has also called a meeting for tomorrow morning to draft a letter for closure (I'll learn the precise meaning of such at the meeting but I gather it will mean termination from at least this program). In attendance will be Heather [Reed], university police and lawyer(s), representative from the GS [graduate school] and myself.

I write this mail not to alarm anyone but Heather [Reed] and Duane [Crawford] are concerned for Grace's potential to be self-destructive. Heather [Reed] also indicated that such behavior has the potential to extend to others."

(Doc. 72-5, pg. 7, Plaintiff's Exhibit 32)

47. "A CIRT [Critical Incident Response Team] was called and the team met on

May 4, 2012". "The purpose of the meeting was to discuss the incident and to

develop an action plan." (Doc. 76-3, Ms. Reed Declaration, ¶ 8).[10] "After the

discussion, it was determined that Lee did not appear to be dangerous". (Doc.

76-3, Ms. Reed Declaration, ¶ 9)

48. On May 4, 2012, Ms. Reed sent a terse email to Plaintiff Lee mandating a

meeting with her, and asked her "not [to] have any contact with faculty or staff

at the Department of Statistics or the Graduate School." Ms. Reed didn't give

---

[10] Defendants rejected Plaintiff's Request for Production of records relating to the CIRT. (Doc. 72-7, Plaintiff's Exhibit 54, Defendants' Response to Plaintiff's Request for Production #16)

a reason why Plaintiff Lee was not to contact with faculty or staff at the Department of Statistics or the Graduate School. (Doc. 72-5, pg. 11, Plaintiff's Exhibit 34)

50. The May 7, 2012 "mandatory" meeting of Defendant Guikema, Ms. Reed and Plaintiff Lee was the only meeting that KSU officials held with Plaintiff throughout the process of her dismissal. (Doc. 73, Plaintiff's Declaration, at ¶ 32).

51. In the May 7, 2012 meeting, Defendant Guikema told Plaintiff Lee: "what I view is what will happen is sometime within the next few days to a week that your department will recommend to the graduate school that you be dismissed because one crucial element of success is to make a linkage with a major professor and to make a mentoring relationship with - with a major professor. And so probably in my view, rightly so, your department is going to recommend that you be dismissed." (Doc. 68-16, May 7 meeting transcript[11], on the 5th miniature page).

52. Throughout the whole May 7, 2012 meeting, neither Defendant Guikema nor Associate Dean of Student Life Ms Reed, spoke to Plaintiff Lee regarding the alleged May 2, 2012 yelling and screaming incident in the Graduate School, or

---

[11] The May 7, 2012 meeting transcript was prepared by Defendants based on the tape recording provided by Plaintiff. Defendants incorrectly marked the date of the meeting as May 2, 2012 on the first miniature page of the meeting transcript.

13

her alleged "erratic, aggressive " "self-destructive" behavior that "has the

potential to extend to others", or the May 4, 2012 CIRT meeting against her.

(Doc. 68-16, May 7 meeting transcript)[12]

53. On May 8, 2012, Defendant Neill wrote the Graduate Student Progress

Committee (SPC) in the Department of Statistics:

"Collegues,

I am writing you as the members of the Graduate Student Progress Committee. Please recall my email [Plaintiff Exhibit 32] dated 5/3/2012 which detailed the circumstances involving Grace Lee. The result of the meeting with Heather Reed, graduate school, university lawyers, police, etc. which occurred last Friday as indicated in the 5/3 mail, led to a meeting yesterday [May 7, 2012] with Heather Reed, Jim Guikema and Grace. The mail below indicates the purpose of the meeting.

I talked with Heather [Reed] late yesterday after the meeting. Grace was informed that her options in this department are essentially zero, given her behavior and lack of academic progress (in particular, her failure to locate another major professor). Jim [Guikema] told her that she has approximately 6 weeks to find another department (e.g. math, computer science, etc) that she could move to before the Graduate School will terminate her status as a graduate student at KSU.

I believe that this department has done all that it can to help Grace move forward ( a decision that the Graduate School concurs with as well). I have been given permission from the Graduate School to formally request that Grace be terminated from our program (She did earn an MS degree in 2010 from the department), but she will have the option of finding another department as mentioned above. Although I have not received any dissenting opinions from faculty, I would rather not act unilaterally. Thus, I would like to formally request from the committee if there is any reason not to proceed. As I would like to submit the request to the GS as soon as possible, if deemed appropriate, please let me know your thoughts as soon as convenient. Thanks.

---

[12] Plaintiff had never received any communication from Defendants or other KSU officials regarding her alleged behaviors (Doc. 73, Plaintiff Declaration at ¶ 31; Doc. 77-2 Second Declaration of Grace Lee at ¶ 6). In fact, Plaintiff Lee first learned about the accusations against her regarding her behavior through the discovery of this suit on Dec 23, 2013, 20 months after KSU officials made the accusations against her.(Doc. 73, Plaintiff's Declaration, at ¶ 34)

14

Jim"

(Doc. 72-5, pg. 25, Plaintiff's Exhibit 38)

54. Without being given an opportunity to hold a meeting to discuss about the dismissal, or an opportunity to verify the accusations against Plaintiff Lee regarding her alleged behavior issues, the SPC voted by email on her dismissal. Two committee members abstained and the other two committee members voted in support. (Doc. 72-5, pg. 25-33, Plaintiff's Exhibit 38, 39, 40; Doc. 72-6, pg. 1, Plaintiff's Exhibit 41).

55. Chair of the SPC Dr. Higgins wrote Defendant Neill: "Grace's behavior has led to this unfortunate situation. I see that you have no other choice but to terminate her enrollment in our program." (Doc. 72-5, pg. 25, Plaintiff's Exhibit 38).

56. Dr. Weixing Song wrote Defendant Neill: "I would like to abstain on Grace Lee case. I will respect whatever decision made by the department and the graduate school. Thank you for your understanding." (Doc. 72-5, pg. 28, Plaintiff's Exhibit 39).

57. Dr. Kun Chen wrote Defendant Neill: "Thank you for your great effort and for discussing the situation with me just now. As a new member of the department, I have a hard time casting my vote. So I hope I can abstain this time. I want to say that I certainly understand and respect the decision of our department, and

strongly feel that we have tried hard to avoid this situation. I greatly appreciate your understanding." (Doc. 72-5, pg. 31, Plaintiff's Exhibit 40).

58. Dr. Leigh Murray wrote Defendant Neill: "It seems as though you, personally, have tried very hard to make things work for Grace but she hasn't tried (or has been unable) to take advantage of that help. I'm very sorry that things have come to this point but I don't see anything else to be done at this juncture. I fully support your decision." (Doc. 72-6, pg. 1, Plaintiff's Exhibit 41).

59. None of the SPC members mentioned Plaintiff's academic performance in their voting emails. The only factor mentioned was Plaintiff Lee's "behavior" as Chair of the SPC Dr. Higgins wrote: "Grace's behavior has led to this unfortunate situation." (Doc. 72-5, pg. 25, Plaintiff's Exhibit 38).

60. On May 9, 2012, Defendant Neill authored the department dismissal letter stating that Plaintiff Lee's dismissal was "based on her failure to find a replacement major professor". (Doc. 68-12)

61. Several graduate students in the Department of Statistics at KSU didn't have a major professor for much longer time than Plaintiff Lee, or didn't even have a plan to locate a major professor. A graduate student, when being asked if she/he was looking for a major advisor, wrote: "I was not looking yet. I have just returned from Europe and I haven't spent an hour thinking about school stuff." Another graduate student wrote "I have not begun to look for a major

16

advisor. I am planning to do it next semester." (Doc 72-6 at pg. 51-54, Plaintiff's Exhibit 43). None of these graduate students was dismissed or suffered any negative repercussions. (Doc. 72-4, pg. 71, Defendant Neill's Answers to Interrogatories, Request No. 11)

62. Although Ms. Reed barred her from contacting the Department of Statistics starting on May 4, 2012 (Doc. 72-5, pg. 11, Plaintiff's Exhibit 34), Plaintiff Lee, as the instructor of an undergraduate class of 47 students in the Department of Statistics, had to keep in contact with the Department of Statistics and her students to fulfill her teaching responsibility. Plaintiff Lee did not abandon her own students and continued working as an instructor for the Department of Statistics till the last day of the spring semester of 2012. She lectured classes, prepared exams questions, monitored and graded the final exam. (Doc. 73, Plaintiff's Declaration, at¶ 17).

63. On May 11, 2012, Plaintiff Lee received a highly charged email from Defendant Guikema which admonished Plaintiff Lee for having contacted the Department of Statistics. Defendant Guikema wrote: "I have heard from several sources that you have been in contact with faculty members in the graduate program in Statistics. If you recall from the meeting that you and I had in the office of Heather Reed, it was decided that this approach [contacting the

statistics department] would be a BAD IDEA." (Doc 72-6 at pg. 61, Plaintiff's
Exhibit 46).

64. On May 14, 2012, after completing all her duties as an instructor, Plaintiff
replied to Defendant Guikema's email that prohibited her from contacting the
department of statistics:

"I submitted the grade of the course I teach as a TA to the department secretary
for the last time this afternoon and said goodbye to my officemates, fellow
students and a couple of professors. It's all over now. I won't contact the
department of statistics anymore. Thanks.
    Grace"

(Doc 72-6 at pg. 61, Plaintiff's Exhibit 46).

65. On May 15, 2012, Dr. Jager, a faculty member in the Department of Statistics
who was in charge of coordinating undergraduate classes, wrote Plaintiff Lee
telling her that her teaching performance of the semester was "Perfect!" (Doc.
73-1, pg. 2, Plaintiff's Declaration Exhibit B).

66. On May 31, 2012, Defendant Guikema authored the graduate school dismissal
letter stating that the reason for Plaintiff's dismissal was "failure to make
satisfactory progress". (Doc. 68-19, KSU dismissal letter).

67. According to the reinstatement procedure in K-State Graduate Handbook, to
file a petition for reinstatement, "The petitioner must obtain the support of the
graduate program to which she/he wishes to be reinstated or admitted." and
"The supporting graduate program must send a letter to the Dean of the

18

Graduate School indicating their willingness to support the individual's petition
for reinstatement to K-State Graduate School specifying any conditions." (Doc.
68-2, KSU Graduate Handbook, Appendix C Graduate Student Reinstatement
Procedure).

68. On July 5 and July 6, 2012, Plaintiff Lee wrote the Department of Statistics to
seek support for her petition for reinstatement (Doc 72-6, pg. 70, Plaintiff's
Exhibits 48).

69. On July 11, 2012, the Department of Statistics responded to Plaintiff Lee: "the
department will not support your petition." (Doc 72-6, pg. 75, Plaintiff's
Exhibit 50).

70. On July 11, 2012 and July 13, 2012, Plaintiff Lee wrote Defendant Guikema,
entreating him to grant her an exception by allowing her to file a petition
without the support from the Department of Statistics. (Doc. 72-7, pg. 1,
Plaintiff's Exhibit 51).

71. On July 11, 2012, Defendant Guikema wrote Plaintiff Lee: "Going back to a
graduate program that is not supportive is a recipe for failure.", and "we [the
Graduate School] will NOT reinstate you into the Stat graduate program
without their explicit support" (Doc. 72-7, pg. 1, Plaintiff's Exhibit 51).

72. On July 13, 2012, Defendant Guikema wrote Plaintiff: "in order to hold a
reinstatement hearing, we need also a petition letter from Stat[istics] -- which is

19

not likely. So, no – we cannot grant an exception" (Doc. 72-7, pg. 1, Plaintiff's Exhibit 51).

73. On July 24, 2012, Ms. Reed wrote Defendant Neill: "Hopefully, since she [Plaintiff Lee] has been told numerous times that she is no longer a member of your department, she will back off. If she contacts you or any of your staff again, please let me know and I'll set up a meeting with her. Maybe Jim [Guikema] or Duane [Crawford], and I could talk to her face to face and help her understand." (Doc. 72-7, pg. 4, Plaintiff's Exhibit 52).

## SUMMARY OF ARGUMENT

The District Court erred in granting summary judgment in favor of Defendant Guikema and Defendant Neill.

The District Court correctly determined that "Plaintiff's property interest in her continued graduate program is a property interest protected by procedural due process." (Doc 81 at Page 16). What the District Court then did, incorrectly, was to make a factual determination and rule that there was no "evidence" to suggest that Plaintiff Lee was dismissed on the basis of a disciplinary or nonacademic reason. Another error that the District Court made was to make a factual determination and rule that there was no "evidence" to suggest Defendants didn't afford Plaintiff Lee adequate level of due process. Plaintiff Lee did raise a genuine issue of material fact as to the nature of her dismissal and as to whether adequate due process was afforded her by Defendants in her dismissal. The District Court, in effect, assumed the role of the jury in resolving disputed material facts in favor of Defendants.

## ARGUMENT

**I.   ISSUE NO. 1:  Did the District Court err in finding that Ms. Grace Lee's evidence as to her dismissal did not raise a genuine issue of material fact as to whether the dismissal was motivated by factors unrelated to her academic performance?**

Applicable Standard of Review:   De Novo.  Jones v. Denver Public Schools, 427 F.3d 1315, 1318 (10th Cir. 2005).

In *Regents of University of Michigan v. Ewing*[13], the court noted that "When judges are asked to review the substance of a genuinely academic decision…they show great respect for the faculty's professional judgment."[14] However, lower level of judicial deference and higher level of due process are required in disciplinary dismissal decisions. "In Goss, this Court felt that suspensions of students for disciplinary reasons have a sufficient resemblance to traditional judicial and administrative fact-finding that call for a "hearing" before the relevant school authority"[15]. While recognizing that school authorities must be afforded the necessary tools to maintain discipline, the Supreme Court concluded: "[i]t would be a strange disciplinary system in an educational institution if no communication was sought by the disciplinarian with the student in an effort to inform him of his

---

[13] Regents of University of Michigan v. Ewing 474 U.S. 214 (1985)

[14] Id. at 255.

[15] Board of Curators of Univ. of Missouri v. Horowitz, 435 U.S. 78. at 88-89

22

dereliction and to let him tell his side of the story in order to make sure that an injustice is not done."[16] The 10th Circuit concurs the Supreme Court that lower level of judicial deference is required in nonacademic dismissal decisions: "the notion of judicial deference to academic decisions loses force when, as here, the decision maker is 'accused of concealing nonacademic or constitutionally impermissible reasons' for its action."[17]

Defendants maintain in their motion for summary judgment that Plaintiff Lee's dismissal was academic in nature, undoubtedly to secure greater judicial deference. The District Court ruled in favor of Defendants and determined that there was no evidence to suggest that the dismissal contains disciplinary or nonacademic element. (Doc. 81 at Page 23, District Court order)

However, facts show that Plaintiff Grace Lee was dismissed from the Department of Statistics and the Graduate School in KSU for disciplinary reason or nonacademic reason, but was not afforded the required due process, in violation of the property interest in her continue education under 42 U.S.C. section 1983.

## A. The vote on Plaintiff Lee's dismissal was based on unfounded disciplinary accusations against her

Records show that the first time that KSU officials considered dismissing Plaintiff was on May 2, 2012. According to Ms. Heather Reed's Declaration, one

___

[16] Goss v. Lopez, 419 U.S. 565 (1975). at 580

[17] Gossett v. Oklahoma ex rel. Board of Regents for Langston Univ., 245 F.3d 1172 (10th Cir. 2001)(citing Regents of the Univ. of Mich. V. Ewing, 474 U.S. 214, 255 (1985))

week prior to Plaintiff's dismissal, "On May 2, 2012, there was an incident in which Grace Lee was reported to be yelling and disruptive in the Graduate School office." (Doc. 76-3, Reed Declaration, ¶ 7)[18]. On the same day, Defendant Neill and Ms. Reed had "a long conversation" that resulted in Ms. Reed's email to other KSU officials including Defendant Guikema: "I had a long conversation with Jim [Neill] and we think a meeting to plan our response and her [Plaintiff Lee's] separation from the university is prudent, considering her erratic, aggressive behavior." (Doc. 72-5, pg. 1, Plaintiff's Exhibit 31).

On May 3, 2012, Defendant Neill wrote all faculty members in the Department of Statistics indicating that Plaintiff Lee's "self-destructive" behavior "has the potential to extend to others", and the university administration including "university police and lawyer(s)" were to have a meeting on the next day to draft a letter for the termination of Plaintiff Lee from the program. (Doc. 72-5, pg. 7, Plaintiff's Exhibit 32).

According to Ms. Reed's declaration, "A CIRT [Critical Incident Response Team] was called and the team met on May 4, 2012". "The purpose of the meeting was to discuss the incident and to develop an action plan." (Doc. 76-3, Ms. Reed

---

[18] Plaintiff Lee declares under penalty of perjury that she did not visit the Graduate School on May 2, 2012. (Doc. 77-2, Second Declaration of Grace Lee, ¶ 4) In addition, Plaintiff declares under penalty of perjury that she has never yelled, screamed or been disruptive on KSU campus or in any KSU Graduate School office. (Doc. 77-2, Second Declaration of Grace Lee, ¶ 5).

Declaration, ¶ 8). "After the discussion, it was determined that Lee did not appear to be dangerous". (Doc. 76-3, Ms. Reed Declaration, ¶ 9)

On May 8, 2012, without notifying the faculty of the decision of the CIRT meeting to correct his previous incorrect message that Plaintiff Lee was dangerous, Defendant Neill wrote the Student Progress Committee(SPC) in the Statistics Department: "The result of the meeting with Heather Reed, graduate school, university lawyers, police, etc. which occurred last Friday as indicated in the 5/3 mail, led to a meeting yesterday [May 7, 2012] with Heather Reed, Jim Guikema and Grace." that "Grace was informed that her options in this department are essentially zero, given her behavior…thus I would like to formally request from the committee if there is any reason not to proceed [the dismissal]." (Plaintiff's Exhibit 38).

In his May 3, 2012 and May 8, 2012 emails, Defendant Neill presented Plaintiff Lee's alleged behavior as the main issue to the faculty members in the department, and requested the SPC to vote on the dismissal of her. The effects of the severe accusation against Plaintiff on the faculty are vividly reflected by the distinct difference of the faculty's attitude toward Plaintiff Lee in their April 2012 emails and May 2012 emails. In their April 2012 emails, as set forth within preceding Paragraph 29 of Statement of The Fact hereof, the faculty's attitude toward Plaintiff Lee was warm, sympathetic, encouraging and positive. One of the

faculty members, though could not take the major professor role, indicated that Plaintiff Lee was a "very good student", several other faculty members wished her good luck, and most importantly, faculty members were willing to open their doors to Plaintiff Lee. At the minimum, the faculty had never had an intention to dismiss Plaintiff Lee in April 2012. In contrast, on May 8, 2012, the attitude of the faculty members toward Plaintiff Lee was cold and despised, as set forth within preceding Paragraphs 55-58 of Statement of The Fact hereof. What caused the dramatic change? The only thing that could cause the change of the faculty members' attitude to Plaintiff Lee within such a short period was the severe accusations against her that were conveyed to them through Defendant Neill's May 3, 2012 and May 8, 2012 emails. With the mention of "university police and lawyers" and the CIRT, the charges against Plaintiff in the two emails were serious. No faculty member would like to keep a student whose "self-destructive" behavior "has the potential to extend to others" in the department. There is no evidence that the CIRT's determination that Plaintiff Lee was not dangerous was ever conveyed to the faculty members in Department of Statistics. Not surprisingly Chair of the SPC Dr. James Higgins wrote in his voting email: "Grace's behavior has led to this unfortunate situation" (Doc. 72-5, pg. 25, Plaintiff's Exhibit 38). It is notable that none of the SPC members mentioned anything related to Plaintiff's academic

performance in their voting emails. (Doc. 72-5, pg. 25-33, Plaintiff's Exhibit 38, 39, 40; Doc. 72-6, pg. 1, Plaintiff's Exhibit 41).

The District Court incorrectly determined the nature of Plaintiff's dismissal as academic, stating: "In Horowitz, the faculty determined that the student's clinical performance was unsatisfactory, and part of their evaluation concerned her lack of 'critical concern for personal hygiene,' a behavior not directly related to her academic performance. Yet, the process was still deemed an academic, not disciplinary" (Doc. 81 at Page 25). However, what makes the present case distinct from *Horowitz* is that the faculty's review on Horowitz was focused on Horowitz's academic performance, not on her personal hygiene; while the faculty's review on Grace Lee was focused on Grace's alleged behaviors instead of her academic performance. In *Horowitz[19]*, in her first year of study, Horowitz was put on probation[20] because her "performance was below that of her peers in all clinical patient-oriented settings"[21]. "Faculty dissatisfaction with respondent [Horowitz]'s clinical performance continued during the following year"[22]. The Supreme Court noted: "The evidence presented in this case totally failed to establish that plaintiff [respondent] was expelled for any reason other than the quality of her work."[23]. In contrast, in the present case, none of the SPC members mentioned anything related

---

[19] Board of Curators of Univ. of Missouri v. Horowitz, 435 U.S. 78 (1978)

[20] Id. at 81.

[21] Id.

[22] Id,

[23] Id, at 94-95

to Plaintiff Lee's academic performance in their voting emails, which is completely different from the review that Horowitz received.

## B. There was no contemporaneous document in support of Defendants' allegation that Plaintiff Lee's academic performance was subpar; evidence shows Plaintiff's academic performance was excellent

Applicable Standard of Review: De Novo. Jones v. Denver Public Schools, 427 F.3d 1315, 1318 (10th Cir. 2005).

Though Defendants attempt to paint Grace's academic performance as unsatisfactory, Defendants provide no contemporaneous document to support such argument.

Defendants assert that Plaintiff did not make satisfactory progression by referencing the SPC's evaluation on Plaintiff on April 19, 2012 (Doc. 68-14). However, Defendants have so far refused to provide Plaintiff Lee with the SPC's evaluation comment on Plaintiff that was attached to Dr. Higgins' email to Department Head Neill on April 20, 2012. Nevertheless, Dr. Higgins explained in his declaration that the reason that the SPC evaluated Plaintiff Lee to be one of the two "exceptions" on April 19, 2012, was "because the relationship between Grace and her major professor Dr. Wang had gotten so contentious that it was apparently impossible for them to continue to work together", which obviously referred to the

28

grievances that Plaintiff filed against Dr. Wang. (Doc. 68-13, Higgins Declaration, at ¶ 6). There is no indication that the SPC considered Plaintiff's academic records, such as grade, research or anything relating to Plaintiff's academic performance when they made the evaluation on Plaintiff Lee. The SPC made the evaluation of Plaintiff solely based on Plaintiff's relationship with Dr. Wang, which was not an academic judgment. Further, no one has ever informed Plaintiff of the SPC's concern regarding Plaintiff's relationship with Dr. Wang, and Plaintiff was never given an opportunity to present her side of story to the SPC. (Doc. 73, Plaintiff's Declaration, at ¶ 14). Moreover, there is no indication that the SPC had ever discussed about or considered the dismissal of Plaintiff during their meeting on April 19, 2012. Lastly, according to Dr. Higgins' April 20, 2012 email, there were two students who had received negative evaluation from the SPC in the spring of 2012, and more during the several years prior to the spring of 2012 (Doc. 68-14), however, Plaintiff Lee was "the only graduate student who was dismissed by the Graduate School from the Department of Statistics in this time period" beginning with 2008-09 academic year and ending with 2012-13 academic year (Doc. 72-4, pg. 71, Defendant Neill's Answers to Interrogatories, Request No. 11).

To the contrary of Defendants assertion that Plaintiff had subpar academic performance, Plaintiff Lee was in good academic standing throughout her tenure at the school. In fact, Plaintiff Lee's academic achievements included an overall

GPA 3.95, several academic scholarships awarded by the KSU Statistics

Department, seven papers that were published, passing her Ph.D. qualifying exam,

and the completion of a 225 page dissertation proposal. The evidence is set forth

within preceding Paragraphs 2-7 of Statement of The Fact hereof. Particularly, on

January 30, 2012, merely three month prior to Plaintiff's dismissal, Department

Head Neill confirmed that Plaintiff Lee was on schedule to graduate with her

Ph.D. in Statistics in the spring of 2013; and explicitly stated in writing that

Plaintiff Lee was "making satisfactory academic progress" and that "a promising

amount of technical work accomplished" by her. (Doc. 72-2 pg. 8, Plaintiff's

Exhibit 6).

## C. Even the Surface Reason "Failure to Find a Major Advisor" that Defendants Alleged for Plaintiff's Dismissal was Also Nonacademic

Though the vote to dismiss Plaintiff Lee was passed based on her alleged

behaviors as discussed in the preceding section A hereto, Defendant Neill altered

the dismissal reason into "failure to find a major advisor" in the department

dismissal letter he authored. (Doc. 68-12). Plaintiff Lee asserts that even this

surface reason "failure to find a major advisor" was nonacademic.

In *Assenov v. University of Utah*[24], a Ph.D. student was dismissed after he refused to sit for his qualifying exam on multiple occasions [25]. Although the dismissal reason provided by the university to Mr. Assenov appeared academic on its face[26], the court nevertheless held, "Dr. Krahenbuhl's decision to dismiss Mr. Assenov on the basis of failing the QE [Qualifying Exam] twice is difficult to characterize as an entirely academic decision."[27] Therefore the court determined that the academic institution was not entitled to the high standard of deference which they requested. The surface reason that Defendants assert "failure to find a major advisor" in the present case parallels that of *Assenov*. Most notably, a particular statement of the court therein is especially on point: "It is hard to see Mr. Assenov's refusal to show up to the March QE as a reflection of his academic performance or his potential success as a nuclear engineer."[28] Similarly, it is hard to see Plaintiff Lee's temporary lack of a major advisor for 19 days as a reflection of her academic performance or her potential success as a statistician.

In summary, Plaintiff Grace Lee produced evidence which established that the dismissal was motivated by nonacademic factors and the nature of dismissal was disciplinary or nonacademic. The District Court's holding "the dismissal was academic, not disciplinary" (Doc. 81, at page 23) was in error. The problem with

---

[24] Assenov v. University of Utah, 553 F. Supp. 2d 1319 (D. Utah 2008)

[25] Id. at 1332

[26] Id. at 1330.

[27] Id.

[28] Id.

31

the district court's analysis was viewing the evidence in the light least favorable to
non-moving party Grace Lee and drawing all reasonable inferences against her.

## II.    ISSUE NO. 2:  Did the District Court err in finding that Ms. Grace Lee's evidence as to her dismissal process did not raise a genuine issue of material fact as to whether she was provided the due process required by the nature of her dismissal?

In *Goss*[29], several high school students were suspended for ten days for
destroying school property and disrupting the learning environment. The Supreme
Court pointed out: "At the very minimum, therefore, students facing suspension
and the consequent interference with a protected property interest must be
given some kind of notice and afforded some kind of hearing." [30] Such notice and
hearing requires that the student be given "oral or written notice of the charges
against him and, if he denies them, an explanation of the evidence the authorities
have and an opportunity to present his side of the story."[31] Lower courts ruled that
in disciplinary or nonacademic cases, at least the basic protections called for in

---

[29] Goss v. Lopez, 419 U.S. 565 (1975).

[30] Id. at 579.

[31] Id. at 581.

*Goss* will apply: notice[32] and, in the event of a denial by the student, a statement of the evidence relied upon, and a chance to rebut[33].

In *Goss*, the Supreme Court further noted: "Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures."[34] In the present case, Plaintiff Lee was subjected to dismissal, which was more severe than the ten days suspension to which several high school students had been subjected in *Goss*, but she was afforded far less due process than that the Supreme Court requires. Six years of Plaintiff Lee's academic career was thrown away without even the opportunity to present her side of the story.

## A. Plaintiff Lee was neither notified of the charges against her, nor given an opportunity to rebut the accusations regarding her behaviors, based on which the SPC cast their votes to dismiss her

As the Supreme Court in *Goss* stated, students must be given "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."[35]

---

[32] Gorman v. University of Rhode Island, 837 F.2d at 12
[33] Roach v. Univ. of Utah, 968 F. Supp. 1446, 1452 (D. Utah 1997) (calling for notice and some opportunity to be heard); Carboni v. Meldrum, 949 F. Supp. 427 (requiring reasonable opportunity to present her side of story); Aubuchon v. Olsen, 467 F. Supp. 568, 573 (E.D. Mo. 1979) (requiring notice, opportunity to present accused's version and to rebut opposing evidence)
[34] Goss v. Lopez 419 U.S. 565 at 584 (1975).
[35] Id. at 581.

33

Evidence shows that Defendants had neither provided Plaintiff with a notice of the charges against her, nor given her a chance to defend herself.

Throughout the whole dismissal process, though Defendants made severe charges against Plaintiff Lee in multiple occasions, not once was Plaintiff Lee notified of the charges and accusations against her, nor was she permitted to defend herself. Plaintiff Lee testifies under oath that she had never received any communication from Defendants or other KSU officials regarding her alleged behaviors. (Doc. 73, Plaintiff Declaration at ¶ 31; Doc. 77-2 Second Declaration of Grace Lee at ¶ 6). It is notable that on May 7, 2012, Defendant Guikema, Ms. Reed and Plaintiff had a "mandatory" meeting, which was the only meeting that Plaintiff was afforded in the dismissal process. Oddly, neither Defendant Guikema nor Associate Dean of Student Life Ms. Reed mentioned the accusations against Plaintiff regarding her behaviors (Doc. 68-16, May 7 meeting transcript). The Supreme Court in *Goss* stated: "[F]airness can rarely be obtained by secret, one sided determination of facts decisive of rights. . . ." and "Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it."[36] The action that Defendants kept from informing Plaintiff Grace Lee of the

---

[36] Goss v. Lopez 419 U.S. at 580 (1975).

34

accusations against her was not in accordance with the instruction of the Supreme Court.

Though the accusations against Plaintiff Lee was not notified to her, on May 3, 2012 and on May 8, 2012, twice were the disciplinary accusations against her conveyed to the faculty and the SPC in the department of statistics, accompanied by Defendant Neill's indication that he would like to submit the request to dismiss Plaintiff to the graduate school "as soon as possible". As the result, the dismissal decision was made through email voting without a discussion prior to it.

"By its nature, a charge of misconduct, as opposed to a failure to meet the scholastic standards of the college, depends upon a collection of the facts concerning the charged misconduct, easily colored by the point of view of the witnesses. In such circumstances, a hearing which gives the Board or the administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved."[37] In the present case, every meaningful hedge against the erroneous action had been skipped. Plaintiff had no opportunity to defend herself; she had had no opportunity to view any evidence against her; she was not informed of the charges against her, and she was punished without a basis in substantial evidence.

---

[37] Dixon v. Alabama State Board of Education, 294 F.2d at 158, 159 (5th Cir. 1961).

35

**B. Defendants didn't properly inform Plaintiff Lee of the consequence of temporary lack of a major professor; many graduate students had no major professor for much longer time than Plaintiff**

The goal of the due process is to keep the student as informed as possible as to the step taken that may lead to "termination". Even for an academic dismissal case like *Board of Curators v. Horowitz*[38], the Court noted that, the student should be "fully informed of the faculty's dissatisfaction with her clinical progress and the danger that this posed on continued enrollment"[39] Since the deprivations alleged by Plaintiff in the present case did not involve any academic judgment, higher level of due process is required.

Evidence shows that Defendants didn't provide Plaintiff with proper notice regarding the consequence of missing the April 27, 2012 deadline to find a replacement major advisor.

When Defendant Neill set the April 27, 2012 deadline for Plaintiff Lee, he noted that the April 27, 2012 deadline was for Plaintiff Lee to find a major advisor so that she could be considered for Graduate Teaching Assistantship by the department. Defendant Neill wrote in his email to Plaintiff: "I will need to know by April 27 (next Friday) whether you have located another professor (and which

---

[38] Board of Curators v. Horowitz , 435 U.S. 78 (1978).
[39] Id. at 85.

professor this is) to supervise your research. It is important that I know this information as Dr. Song (as Graduate Program Director) and I are now deciding on fall GTA [Graduate Teaching Assistantship] appointments". (Doc. 68-11, pg.2). The "consequence" of missing the April 27, 2012 deadline that Defendant Neill informed Plaintiff Lee of, was losing the GTA position of the next semester, which is so far away from Plaintiff's dismissal. If Defendant Neill did mean that Plaintiff Lee's continued enrollment would be in danger if she could not find a replacement major professor by the April 27, 2012 deadline, it was odd that he did not inform her explicitly. Instead, he informed Plaintiff that her temporary lack of major professor would only affect her GTA position of the next semester. Such action does not constitute a proper notice to the student of "the danger that this posed on continued enrollment"[40].

Further, evidence shows that many graduate students in the department of statistics had no major advisor for longer time or didn't even have a plan to find one, but they did not suffer any negative repercussion. A graduate student, when being asked if she/he was looking for a major advisor, wrote: "I was not looking yet. I have just returned from Europe and I haven't spent an hour thinking about school stuff." Another graduate student wrote "I have not begun to look for a major

---

[40] Id. at 78.

advisor. I am planning to do it next semester." (Doc. 72-6 at pg. 51-54, Plaintiff's Exhibit 43).

Besides setting an extremely short arbitrary timeframe for Plaintiff, Defendant Neill "strongly suggested that only faculty members with tenure should consider becoming her [Plaintiff Lee's] advisor" in April 24, 2012 faculty meeting, making it even harder for Plaintiff Lee to locate a major professor in the extremely truncated timeframe. (Doc. 72-4, pg. 64, Plaintiff's Exhibit 27, faculty meeting minutes, section 'Grace Lee'). Since several tenured faculty members in the department were retiring within a couple of months as of April to May 2012, Defendant Neill effectively allowed only two faculty members to consider being Plaintiff's major advisor. (Doc. 73, Plaintiff's Declaration, at ¶ 6). In contrast to the requirement set by Defendant Neill, there is nothing in KSU Graduate Handbook or Statistics Department Handbook that indicates that only tenured faculty members should consider becoming a graduate student's major advisor (Doc 68-2, KSU Graduate Handbook). In fact, many other students in the department of the statistics had untenured faculty member as their major advisors. (Doc. 73, Plaintiff's Declaration, at ¶ 7).

Under certain condition, the courts allow university officials to treat a student differently than other students. In *Regent of Univ. if Michigan v. Ewing*[41], the

---

[41] Regent of Univ. if Michigan v. Ewing, 474 U.S. 214 (1985)

38

university barred the plaintiff from retaking the NBME exam after he failed in the first try, but allowed other students to retake the exam[42]. Considering the plaintiff's "entire career at the University of Michigan"[43], the Supreme Court found the university's action not unreasonable because of the plaintiff's "singularly low score on the NBME Part I examination"[44] and "an unenviable academic record characterized by low grades, seven incompletes, and several terms during which he was on an irregular or reduced course load"[45]. However, in the present case, Plaintiff Lee had excellent academic records during the entirety of her tenure at KSU, as set forth within preceding Paragraphs 2-7 of Statement of The Fact hereof. Defendants provide no reason in justifying their treating Plaintiff Lee differently than other students.

The foregoing evidence clearly shows the bias against Plaintiff Grace Lee, and the arbitrary and capricious nature of her dismissal. She was given an extremely short arbitrary timeframe to find a major professor among a greatly reduced pool of faculty members that was set by Defendants arbitrarily; while many other graduate students in the department did not have the constraints imposed on them and did not suffer any negative repercussion even they had no major advisor for much longer time.

---

[42] Id. at 221.
[43] Id. at 228.
[44] Id.
[45] Id. at 227.

39

## C. The failure of Plaintiff's appeal for reinstatement was not by any error on Plaintiff's side.

Plaintiff is not required to exhaust administrative remedies in order to pursue a Section 1983 claim[46]. The court generally require that a student be provided notice and a hearing prior to being deprived of a significant property interest in public education[47]. In *Kirkland v. St. Vrain School District*[48], the Tenth Circuit noted that, "The root requirement of the Due Process Clause is that an individual be given an opportunity for hearing before he is deprived of any significant property interest[49]. However, the Court proceeded to state that, "there are some situations in which a postdeprivation hearing will satisfy due process requirements."[50] To determine what process is due, the Tenth Circuit balances three factors: "first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest."[51]

---

[46] Patsy v. Florida Board of Regents, 457 U.S. 496, 501 (1982)

[47] Patsy v. Bd. Of Regents, 457 U.S. 496, 516 (1982); Hopkins v. Okla. Pub. Employees Retirement Sys., 150 F.3d 1155, 1160 (10th Cir. 1998)

[48] Kirkland v. St. Vrain School District, 464 F.3d 1182 (10th Cir. 2006)

[49] Id. at 1187

[50] Id.

[51] Id. at 1188.

Regarding the first factor, "the private interest that will be affected by the
official action", pursuit of a doctoral degree is private interest worthy of due
process protection.

Regarding the second factor "risk of an erroneous deprivation under the
process used"[52] identified by Kirkland court, the risk of an erroneous dismissal of a
doctoral student without pre-deprivation due process is high as noted by the court
in *Assenov v. University of Utah*, "allowing the [graduate school] director the
unfettered ability to dismiss a doctoral student without prior notice of his failure
and without giving him an opportunity to argue his position presents a good deal of
risk and could foreseeably lead to mistakes."[53]

The third factor identified in Kirkland is the interest of the government.
Defendants do not point to any governmental interest that justifies dismissing
Plaintiff without prior process. "Pre-deprivation process is most commonly denied
when there is some tangible need to make a quick decision."[54] Defendants provide
no evidence that establishes beyond question that Plaintiff Lee had to be dismissed
quickly.

Accordingly, all of the Kirkland factors militate toward requiring pre-
termination due process in the present case.

---

[52] Id.

[53] Assenov v. University of Utah, 553 F. Supp. 2d 1319, 1332 (D. Utah 2008)

[54] Kirkland v. St. Vrain School District, 464 F.3d at 1193-94

Though post-deprivation due process is insufficient, Plaintiff Lee complied with the appeal/petition procedures, as set forth within preceding Paragraphs 68-72 of Statement of The Fact hereof. However her petition ended in futile. The graduate student reinstatement procedure set forth in the KSU graduate handbook is so fatally flawed that even if a student follows the procedure, she/he is all but guaranteed to be denied reinstatement without the opportunity for a hearing or any appeal procedure. According to the guidelines for reinstatement published in the KSU graduate school handbook, a petitioner must first contact and obtain the support of the graduate program to which she/he wishes to be reinstated before the graduate school will even form a committee to hear the petitioners appeal (Doc. 68-2, KSU Graduate School Graduate Handbook, Appendix C Graduate Student Reinstatement Procedure). In other words, before the petitioner is allowed a hearing they must get the support of the very department that just dismissed them. Plaintiff Lee followed the petition procedure and not surprisingly she was never afforded a hearing or the opportunity to defend herself. She first petitioned the statistics program, the same one she was just dismissed from, and asked them to support her reinstatement, which was summarily denied. She then petitioned the Associate Dean of the Graduate School, Defendant Guikema, who denied her appeal because she had not first received the support of the statistics program. The egregious structure of the graduate school reinstatement process coupled with the

behavior of the officials enforcing the procedure all but assured that Plaintiff Lee would be denied her due process during her dismissal.

The dispute about whether Plaintiff Grace Lee was afforded adequate due process in her dismissal was a dispute about a material fact. Plaintiff Grace Lee produced evidence which established that the due process afforded her was inadequate. The District Court's holding that "Plaintiff was accorded an appropriate level of due process" (Doc. 81 at Page 18) was in error. The problem with the district court's analysis was viewing the evidence in the light least favorable to non-moving party Grace Lee and drawing all reasonable inferences against her.

## CONCLUSION

For the above reasons, Plaintiff-Appellant Grace Lee respectfully requests

this Court to vacate the summary judgment and remand this case for further

proceedings and trial.

## STATEMENT AS TO ORAL ARGUMENT

Oral argument is requested in this matter due to the importance of the issues

involved and in order to address any legal and factual questions the Court may

have after reviewing the briefs and record submitted.


Respectfully submitted,


Signature: Grace Lee

Grace Lee, *Pro Se*
198 Mt. Vernon St., S1
Malden, MA 02148
785-340-3340
GraceLee695@gmail.com


Dated: November 3, 2015

44

# CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certifies that this brief

complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R.

App. P. 32(a)(7)(B)(iii), this brief includes 12,883 words.

2. This brief has been prepared in proportionally spaced typeface using

Microsoft Word 2011in 14 point Times New Roman font. As permitted by Fed. R.

App. P. 32(a)(7)(C), the undersigned has relied upon the word count of this word

processing system in preparing this certificate.

By: Grace Lee

Grace Lee, Pro se

Dated: November 3, 2015

45

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November, 2015, I sent a copy of

APPELLANT'S OPENING BRIEF to M.J. Willoughby, the counsel for Defendant

Dr. James A. Guikema and Defendant Dr. James W. Neill by U.S. Mail, postage

prepaid at:

M.J. Willoughby
Assistant Attorney General
Memorial Bldg., 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597

I also certify that the correct number of copies of APPELLANT'S

OPENING BRIEF was sent via U.S. Mail to the United States Court of Appeals

for the Tenth Circuit, Office of the Clerk this 3rd day of November, 2015.

Date: $11/03/2015$

Signature: Grace Lee

Grace Lee, *Pro Se*
198 Mt. Vernon St., S1
Malden, MA 02148
785-340-3340
GraceLee695@gmail.com

46

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

)
**GRACE LEE,**              )
)
**Plaintiff,**        )
)
**v.**                  )     **Case No. 12-cv-2638-JAR**
)
**DR. CAROL W. SHANKLIN, et al.,**  )
)
**Defendants.**      )
_____)

## MEMORANDUM AND ORDER

Plaintiff Grace Lee filed a complaint against Kansas State University ("KSU"), Dr. Carol W. Shanklin, Dr. James A. Guikema, Dr. Duane W. Crawford, Dr. James W. Neill, Dr. Haiyan Wang, and Ms. Heather Reed ("Defendants"), seeking damages related to her termination from a graduate teaching assistant position and from her graduate studies in statistics at KSU. The Court previously dismissed all claims against KSU, all claims against Defendants in their official capacities, Counts II through X against Defendants in their individual capacities, and the procedural due process claim in Count I against Defendants Shanklin, Crawford, Wang, and Reed in their individual capacities. The only remaining claim in this case is Plaintiff's procedural due process claim in Count I against Defendants Guikema and Neill ("Movants") in their individual capacities.

Before the Court are Defendants' Motion for Summary Judgment (Doc. 67), Plaintiff's Motion for Leave to File a Surreply Memorandum in Opposition To Defendants' Motion for Summary Judgment (Doc. 77), and Defendants' Motion to Strike Surreply (Doc. 78). Defendants argue they are protected by qualified immunity. Movants also argue that even if they are not protected by qualified immunity there is no genuine dispute as to any material fact, and

Movants are entitled to judgment as a matter of law on Count I. The motion is fully briefed, and the Court is prepared to rule. For the reasons set forth below, the Motion for Summary Judgment is granted. Plaintiff's Motion for Leave to File a Surreply is granted and Movants' Motion to Strike is denied.

## I.    Standards for Summary Judgment on Qualified Immunity

Defendants move for summary judgment on Plaintiff's procedural due process claim in Count I, on the basis that they are protected by qualified immunity and are thus entitled to judgment as a matter of law. Qualified immunity protects public officials performing discretionary functions unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."[1] Qualified immunity leaves "ample room for mistaken judgments," protecting "all but the plainly incompetent or those who knowingly violate the law."[2]

As the Tenth Circuit explained in *Rojas v. Anderson*,[3] "because qualified immunity is designed to protect public officials from spending inordinate time and money defending erroneous suits at trial," the qualified immunity defense triggers a modified summary judgment standard.[4] The initial burden rests on the plaintiff, rather than the defendant; and the plaintiff must first "clear two hurdles:" (1) demonstrate that the defendant violated her constitutional or statutory rights; and (2) demonstrate that the right was clearly established at the time of the

---

[1]*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[2]*Malley v. Briggs*, 475 U.S. 335, 341 & 343 (1986).

[3]727 F.3d 1000, 1003 (10th Cir.2013).

[4]*Id.*

2

alleged unlawful activity.[5] The court may decide the appropriate order to consider these issues.[6] Only if the plaintiff clears these hurdles does the burden shift back to the movant defendant to make the traditional showing that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law.[7]

In determining whether the plaintiff has demonstrated a violation of her constitutional or statutory rights and that the right was clearly established at the time, the court must view the facts and draw reasonable inferences in the light most favorable to the party opposing summary judgment. In *Scott v. Harris*,[8] the Supreme Court held that "[T]his usually means adopting . . . the plaintiff's version of the facts," unless that version "is so utterly discredited by the record that no reasonable jury could have believed him."[9] In *Scott*, the plaintiff's version of the facts was discredited by a videotape that completely contradicted plaintiff. Thus, although the court should generally accept the non-movant plaintiff's version of the facts and draw reasonable inferences in the light most favorable to the plaintiff, the Court need not accept alleged facts that are contradicted or discredited by the record. Moreover, citing to the *Scott* decision, the Tenth Circuit has held that "because at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record . . ."[10] In that sense,

---

[5] *Riggins v. Goodman.* 572 F.3d 1101, 1107 (10th Cir.2009)(citing *Pearson v. Callahan.* 129 S.Ct. 808, 815–16 (2009)).

[6] *Camreta v. Greene.* 131 S. Ct. 2020, 2031–32 (2011).

[7] *Rojas v. Anderson.* 727 F.3d 1003–04 (10th Cir.2013).

[8] 550 U.S. 372 (2007).

[9] *Id.* at 378–80.

[10] *Thomson v. Salt Lake City.* 584 F.3d 1304, 1312 (10th Cir. 2009) (internal quotations and citations omitted).

3

the court does not discard the Rule 56 process, but relies upon facts supported by the record, while viewing those facts and reasonable inferences therefrom, in the light most favorable to plaintiff.

Because Plaintiff proceeds *pro se*, some additional considerations frame the Court's analysis. The Court must construe Plaintiff's pleadings liberally and apply a less stringent standard than that which is applicable to attorneys.[11] However, the Court may not provide additional factual allegations "to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf."[12] Additionally, a *pro se* litigant is not excused from complying with the rules of the court and is subject to the consequences of noncompliance.[13]

Plaintiff filed but failed to correctly docket a sur-reply[14] to Movants' Motion for Summary Judgment. Movants oppose Plaintiff's attempt to file a sur-reply on that basis as well as that Plaintiff's motion fails to show a sur-reply is warranted. The Court is mindful of the effort expended by Movants in attempting to synthesize the factual averments in their reply brief. The Court also believes Plaintiff had a fair opportunity to litigate the factual clarifications Movants made in their Reply brief. However, given Plaintiff's status as a *pro se* litigant, the Court must construe Plaintiff's filings more liberally than those of a licensed attorney. Given these facts, the Court will consider Plaintiff's sur-reply brief, despite her failure to clearly demonstrate that a sur-reply brief is appropriate in this case.

_____

[11] *Whitney v. New Mexico*, 113 F.3d 1170, 1173 (10th Cir. 1997).

[12] *Id.*

[13] *Ogden v. San Juan Cnty.*, 32 F.3d 452, 455 (10th Cir. 1994) (citing *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) (insisting that *pro se* litigants follow procedural rules and citing various cases dismissing *pro se* cases for failure to comply with the rules)).

[14] Doc. 77.

4

## II.     Uncontroverted Facts and Factual Allegations by Plaintiff that are Supported by the Record

The Court deems uncontroverted, those facts that are supported by the record to which Plaintiff either stipulates, or fails to respond or otherwise properly controvert with reference to record evidence. Consistent with the standards discussed above, the Court accepts Plaintiff's factual allegations to the extent they are properly supported by the record. Many of Plaintiff's additional facts in her response to the motion for summary judgment are not properly supported by the record, are based on inadmissible hearsay, or are conclusory statements. These additional facts the Court disregards.   Also, the Court does not accept factual allegations that are so utterly discredited by the record that no reasonable jury could believe them.  Nor does the Court accept Plaintiff's attempt to controvert admissions she made in response to defendants' request for admissions.  Finally, the Court views these uncontroverted and stipulated facts in the light most favorable to Plaintiff and draws all reasonable inferences in the light most favorable to Plaintiff.

In 2006,  Plaintiff Grace Lee was admitted into the KSU graduate program in statistics.  She received a letter informing her of the Graduate School's requirement that graduate students are responsible for diligent pursuit and timely completion of all responsibilities associated with progress toward a degree.  The letter also contained a citation to the website containing the Graduate Handbook and other Graduate School documents and asked that she review these materials.  Plaintiff received and had access to a copy of both the Graduate School Handbook and the Statistics Department Handbook.  The Graduate Handbook states, and Plaintiff was aware,  that graduate students, including those in the Statistics Department who fail to make satisfactory progress, will lose departmental support and will be recommended for academic dismissal from the Graduate School.

The Statistics Department Handbook states that each student seeking a Ph.D. must conduct dissertation research under a major professor. A dissertation must make an original contribution to knowledge in the student's chosen field. The major professor often helps the student with the idea or refining the idea for the dissertation research topic, which is related to the major professor's areas of research.[15] Serving as a major professor is a substantial commitment of time and expertise, which is reflected in the Statistics Department policy that the dissertation topic remains with the major professor if the student fails to make sufficient progress.[16] General oversight is conducted by a supervisory committee that is chaired by the major professor.

The Statistics Department Handbook further provides that students are expected to make adequate progress in the program—in most cases, two years to complete the masters degree and four years beyond that masters degree to complete the Ph.D. The Statistics Department Handbook also provides that the student's preliminary examination should be taken within five semesters, excluding summers, of passing the qualifying examination. But these are not hard deadlines.

The Statistics Department Handbook also states that ". . . at the discretion of the major professor and/or supervisory committee, if sufficient progress is not being made on a degree research topic then the student must relinquish the research topic for degree purposes." In the Statistics Department, student progress is annually reviewed by the Student Progress Committee;

---

[15]Plaintiff does not controvert this general statement; rather, she argues that Dr. Wang did not perform these duties of a major professor.

[16]The Court accepts the Dean of the Graduate School, Dr. Carol Shanklin's declaration on this point. Plaintiff merely "objects" to the statement, without pointing to reason or record evidence controverting it.

6

and the Graduate Student Progress Committee of the Graduate School makes a list every semester of students it determines are not making satisfactory progress toward completion of a degree.

Plaintiff and her major professor, Dr. Haiyan Wang, had a difficult relationship. Dr. Wang served as Plaintiff's sole major professor until Plaintiff filed a grievance alleging that Dr. Wang had fallen short of her duties as a major professor, and exhibited unprofessional and abusive conduct towards Plaintiff. The grievance was resolved by Dr. James Neill, the head of the Statistics Department, agreeing to serve with Dr. Wang as a co-major professor to Plaintiff, so Plaintiff could continue her dissertation work with Dr. Wang.

Then, on March 18, 2012, Plaintiff filed a second grievance seeking to remove Dr. Wang as her major professor. Students are permitted to change their major professor. It is the policy of the Graduate School that students are responsible for finding a major professor who is willing to oversee their work in an area of mutual research interest; it is not the policy of the Graduate School to assign major professors to students.[17] The Graduate School approved Plaintiff's grievance, and on April 4, Plaintiff signed a Program/Committee Change Form removing Dr. Wang and Dr. Neill as Plaintiff's major professors. Plaintiff did not notice that Dr. Neill's name had been removed from the form and did not realize that by signing the form, she in effect had no major professor. But Dr. Neill, who works in a different area of statistics, told Plaintiff that

---

[17]Plaintiff attempts to controvert this statement of Dr. Carol Shanklin, Dean of the Graduate School, who states that she has personal knowledge of its policies and procedures. Plaintiff merely objects that this statement is vague and without foundation, but points to no admissible evidence that controverts that this is the policy of the Graduate School. Instead, Plaintiff cites to an inadmissible hearsay statement purportedly made by Dr. Shanklin in a September 21, 2011 meeting that if Plaintiff could not find another major professor, Dr. Shanklin would intervene and have Dr. James Neill, the head of the Statistics Department, appoint her a major professor. Although the Court disregards that statement as hearsay, as noted below, the Court accepts the allegation that in practice, the Graduate School assisted Plaintiff with finding a major professor after Plaintiff's first grievance to remove Dr. Wang.

7

she needed a major professor to supervise her research. And Plaintiff knew that she could not obtain a Ph.D. without having a major professor to supervise her dissertation research.

On April 9, 2012, Dr. Neill told Plaintiff that she was "free to find another professor within the department with which to work," but "[i]n order to track your academic progress, you will need to keep me informed as to which faculty is available and willing to supervise your work." At a staff meeting on April 13, Dr. Neill and other Statistics Department faculty discussed Plaintiff's situation and the Statistics Department policy that a dissertation topic was relinquished to the major professor when a student did not make satisfactory progress. Then on April 19, the Statistics Department Student Progress Committee ("SPC"), chaired by Dr. James Higgins, met and determined that Plaintiff and one other student were not making sufficient progress. Plaintiff was not informed of, nor present at the committee meeting. On April 20, the committee reported its findings to Dr. Neill, that Plaintiff was not making adequate progress because Plaintiff and Dr. Wang's relationship had become so contentious they could no longer work together, such that Plaintiff no longer had a major professor and thus could not take the preliminary examination and could not graduate.

Meanwhile, having heard nothing from Plaintiff since his April 9 email to her, on April 19, 2012, Dr. Neill emailed Plaintiff, again telling her that she needed to keep him informed about her progress in obtaining a major professor, and giving her a deadline of April 27 to let him know whether she had found another major professor, and if so, who. Plaintiff had contacted all twelve Statistics Department faculty, by email or in person, seeking a major professor. But Plaintiff did not report these efforts to Dr. Neill, until her April 23 email to Dr. Neill. On that same date, Dr. Neill responded to Plaintiff's April 23 email, reminding Plaintiff of

8

the April 27 deadline. Dr. Neill did not tell Plaintiff that failure to find a major professor by April 27 would lead to her dismissal from the graduate program. Plaintiff never again communicated with Dr. Neill about her progress, either before or after the April 27 deadline.

Plaintiff was unable to find a faculty member in the Statistics Department to serve as her major professor.[18] On April 30, 2012, Dr. Duane Crawford, an Associate Dean of the Graduate School emailed Plaintiff to inform her that he did not see any alternative to her starting her research anew on another topic with another major professor. And on May 1, Dr. Guikema, also an Associate Dean of the Graduate School, emailed Plaintiff to inform her that her chances of completing her Ph.D. in statistics were "almost down to zero," and encouraging her to seek opportunities in other departments of the Graduate School. In a May 2 email to Drs. Crawford and Guikema, Plaintiff wrote "I know some faculty members are not completely disinclined to be my major advisor . . . If the graduate school could step in to coordinate, I believe the result would be much different." On that same date, Dr. Neill conveyed Plaintiff's lack of progress in an email to Heather Reed, Dean of Student Life, and Drs. Crawford and Guikema. Dr. Neill wrote, "I know [Plaintiff] did not even have a conversation with one of our associate professors and did not follow up with another." There was a consensus as early as May 2, that Plaintiff had exhausted her options for finding a major professor within the Statistics Department.[19] At the same time, no one had advised Plaintiff that she must change research topics. Dr. Neill wrote in

---

[18]The Court does not accept Plaintiff's allegations that certain professors declined to serve as her major professor out of fear that Dr. Neill or others did not want them to serve. This allegation is based on hearsay, not admissible record evidence as is required at the summary judgment stage.

[19]Plaintiff attempts to controvert this, stating, "[A]nother faculty member, Dr. Song, told Plaintiff that he had the capability and interest in advising Plaintiff on Plaintiff's chosen research topic." But this statement is inadmissible hearsay. None of Plaintiff's materials provide admissible evidence that Dr. Song had the capability or interest in advising Plaintiff.

9

this same May 2 email to Reed, Crawford and Guikema that "my 4/9 & 19 mails simply indicated that she [Plaintiff] was free to locate another professor to supervise her research (this did not preclude a continuance of her previous work . . .)"

Sometime on May 2, 2012, Heather Reed received a report that Plaintiff had become extremely upset and disruptive in the Graduate School office and had to be escorted out of the building.[20] This triggered the University's Critical Incident Response Team ("CIRT") process. Later on May 2, Ms. Reed wrote to Dr. Crawford, "I had a long conversation with Jim [Neill] and we think a meeting to plan our response and her [Plaintiff's] separation from the university is prudent, considering her [Plaintiff's] erratic, aggressive behavior."

The CIRT, which is chaired by Ms. Reed, assesses and coordinates a response to situations presented on campus such as a student death or significant trauma, serious student situations involving medical or psychological concerns, or campus threats or emergencies that directly affect the well-being of students and the campus community. While Ms. Reed had a conversation with Dr. Neill to get background about Plaintiff's situation, Dr. Neill did not dictate any part of the CIRT process. After gathering information and meeting on May 4, the CIRT team concluded that Plaintiff did not appear to be dangerous, that she should be warned about her disruptive conduct, but that no disciplinary action was warranted. Although KSU has a process for expulsions or terminations for disciplinary reasons, such a process was never initiated to dismiss Plaintiff for disciplinary reasons. Dismissals for non-academic reasons, such as violation of the KSU Student Code of Conduct, Honor & Integrity violations, discrimination

---

[20]Plaintiff disputes that she was ever at the Graduate School office on May 2. The Court views the facts in the light most favorable to Plaintiff and accepts that she was not there; however, Plaintiff does not controvert the fact that Ms. Reed received this report of Plaintiff's behavior.

10

or sexual violence, or violations of the Threat Management Policy are not processed by the Graduate School, but rather by other offices. Failure to have a major professor is not listed in the KSU Student Code of Conduct as a ground for discipline.

On May 7, 2012, Plaintiff met with Dr. Guikema and Heather Reed. They told Plaintiff that she would soon be dismissed from the Statistics Department for failing to obtain a major professor and that she would be dismissed from the Graduate School unless she were accepted into a different department in the Graduate School. But Plaintiff was unwilling to change topics for her Ph.D. dissertation. On May 7, Plaintiff received a follow-up email from Dr. Guikema advising her that it was likely that the Graduate School would receive a recommendation from the Statistics Department that Plaintiff be dismissed from the Graduate School for lack of academic progress.

After securing permission from the Graduate School to proceed, on May 8, 2012, Dr. Neill solicited the votes of the Statistics Department Student Progress Committee to determine whether Plaintiff should be terminated from the Statistics Department. The committee voted to dismiss Plaintiff from the Statistics Department for failure to make academic progress.

As of May 9, 2012, Plaintiff had contacted every professor in the Statistics Department to see if he or she would agree to serve as her major professor on her chosen topic; but none agreed to serve. Some claimed they already had too many students. On May 9, Dr. Neill wrote to the Graduate School on behalf of the Statistics Department and recommended Plaintiff's termination from the Statistics graduate program because she lacked a major professor:

> I have consulted with the Graduate Student Progress Committee in the Department of Statistics regarding the academic progress of [Plaintiff]. With no dissenting opinions, the committee and I are recommending that the student be terminated from the Statistics

11

> graduate program. This decision has been made based on her
> failure to find a replacement major professor to supervise her PhD
> research. Dr. Haiyan Wang served as major professor until the
> student filed a grievance with the objective of removing Dr. Wang.
> This request was approved by all concerned. [Plaintiff] has earned
> a MS in Statistics (2010) from the department, and I understand
> that she will have the opportunity to explore discussions with
> related graduate programs.

The Graduate School relies upon an academic department's recommendation regarding

lack of academic progress and normally, the dismissal follows immediately upon the Graduate

School's receipt of the recommendation. Neither Dr. Neill nor Dr. Guikema had ever been

informed by anyone that the law required a formal hearing or any particular process before a

recommendation could be made that a student be dismissed for failure to make academic

progress.

On May 11, 2012, Dr. Guikema emailed Plaintiff a copy of the Statistics Department

recommendation of dismissal from the Graduate School, and advised that he would not process

the dismissal for one month "to allow you a 6 week window to find another program in which to

be successful in your Ph.D. program." Later on May 11, Plaintiff responded by email, advising

Dr. Guikema that she was shocked by the recommendation for dismissal, but grateful that Dr.

Guikema and Dr. Shanklin were affording her a one- month grace period. Still later on May 11,

Dr. Guikema responded by email, that

> The most important thing that you should do with this one month
> period is to keep you[r] eye on the prize—finding a graduate
> program in which you will be successful. It is never a good thing
> to hear bad news, no matter if it has been suggested to you before.
> Please keep me posted on your efforts and to whom you are
> talking. Again—this is confidential information and I will not be
> sharing any information with the people you contact. But I need to
> know that you are making progress. One month is not a lot of
> time. Best – jim.

12

Later on May 11, Dr. Guikema sent Plaintiff another email, reiterating that she should

seek another graduate program, not in the Statistics Department:

> I have heard from several sources that you have been in contact
> with faculty members in the graduate program in Statistics.
> If you recall from the meeting that you and I had in the office of
> Heather Reed, it was decided that this approach would be a BAD
> IDEA. I reiterated that in a recent email.
>
> Further, I have been telling you for the past three weeks that my
> best advice is to contact people in other academic programs. That
> has not happened.
>
> Yet again you are showing that you cannot take advice.
>
> I am close to telling you that I can no longer serve as an advisor to
> you, since at every instance I get no positive action from you and,
> in fact, action which takes us back several steps.

On May 30, 2012, Plaintiff emailed Amanda Umscheid of the Graduate School stating

that it was Plaintiff's "formal decision" not to transfer to another department of the Graduate

School. As of May 31, Plaintiff had no major supervisor to supervise her dissertation research.

Before May 31, Plaintiff had not asked any other department at KSU to accept her into its

graduate program. On May 31, Dr. Guikema signed the letter dismissing Plaintiff from the

Graduate School. In pertinent part the letter stated that the Graduate School was dismissing

Plaintiff from graduate study at KSU, based on the Statistics Department's recommendation that

Plaintiff be dismissed for failure to make satisfactory progress. During the entirety of her tenure

at KSU, Plaintiff had been in good academic standing and had received several academic

scholarships.

Plaintiff did not file a formal grievance regarding her dismissal between March 18 and

May 31, 2012, nor after May 31, 2102. If Plaintiff had filed a formal grievance, Graduate

13

School procedures for academic dismissal, as detailed in the Graduate School Handbook, allowed for the filing of a grievance in response to proposed or final academic discipline. If the grievance cannot be resolved informally, the procedures allow the student to have a full hearing before an impartial committee, partially comprised of other graduate students, with opening and closing statements, submission of written documentation, calling witnesses, using a hearing advisor and a court reporter.

## III. Discussion

Because Movants seek summary judgment on the basis of qualified immunity, the initial burden rests on the plaintiff to: (1) demonstrate that Movants violated her constitutional or statutory rights; and (2) demonstrate that the right was clearly established at the time of the alleged unlawful activity.[21] Plaintiff maintains that in dismissing her for failing to make satisfactory progress on the basis of her no longer having a major professor, Movants violated her right to procedural due process pursuant to 42 U.S.C. § 1983, by depriving her of her right to continued enrollment and graduate education,[22] and that such a right was clearly established at the time of her dismissal.

To succeed on a procedural due process claim, a plaintiff must prove two elements: first, that she possessed a constitutionally protected liberty or property interest such that the due process protections were applicable, and second that she was not "afforded an appropriate level

---

[21]*Riggins v. Goodman,* 572 F.3d 1101, 1107 (10th Cir.2009) (citing *Pearson v. Callahan,* 129 S. Ct. 808, 815–16 (2009)).

[22]The Court previously dismissed Plaintiff's claim in Count I that she was deprived of her liberty interest in her name and reputation. Doc.21.

14

of process."[23] The Court necessarily begins with the threshold question of whether Movants'

actions deprived Plaintiff of a property interest. The parties disagree about the nature of the

property interest implicated by Movants' actions. Plaintiff maintains that she has a property

interest in her continued enrollment and graduate education, while Movants characterize the

property interest as a much narrower interest in pursuing a particular dissertation research

topic.[24] But Plaintiff's interest in continuing to pursue a particular dissertation topic was not

directly implicated by Movants' actions. Indeed, despite the Statistics Department policy,

Plaintiff was allowed to continue with the same dissertation topic, assuming she could find a

sponsoring major professor. And, Plaintiff was given the freedom to choose her own major

professor within the Statistics Department on or before April 27, and in other graduate programs

thereafter.

    When viewed in the light most favorable to Plaintiff, the uncontroverted facts support

characterizing the implicated property interest as the broader property interest Plaintiff claims, a

property interest in her continued graduate program. And, the Supreme Court has held that once

provided, public education becomes "a property interest which may be protected by the Due

Process Clause."[25] Further, the Tenth Circuit has long recognized the property interest in a

graduate student's continued enrollment in a graduate program.[26] Given that, Plaintiff's property

---

[23] *Copelin-Brown v. N.M. State Pers. Office*, 399 F.3d 1248, 1254 (10th Cir.2005) (quotation omitted).

[24] *See Ndefru v. Sherwood*, No. 93-4127-SAC, 1993 WL 544563 (D. Kan. Dec. 29, 1993), *aff'd*, 30 F.3d 142 (table)(10th Cir. Aug. 4, 1994), *cert denied*, 513 U.S. 1128 (1995)(no constitutionally protected property interest in graduate student having his proposed dissertation topic approved).

[25] *Goss v. Lopez*, 419 U.S. 565, 574 (1975).

[26] *See Gossett v. Okla. ex rel Bd. of Regents for Langston Univ.*, 245 F.3d 1172 (10th Cir. 2001) (nursing student had a property right in his nursing education and was entitled to due process under the U.S. Constitution); *Harris v. Blake*, 798 F.2d 419, 422 (10th Cir. 1986) (graduate student had a property interest in his graduate

15

interest in her continued graduate program is a property interest protected by procedural due process.

To establish a violation of procedural due process and thus a violation of her constitutional rights, Plaintiff must next show that she was not afforded an appropriate level of procedural due process. For academic dismissals, the Supreme Court decision in *Board of Curators of University of Missouri v. Horowitz*,[27] clearly establishes the level of appropriate due process, as well as the importance of giving deference to the academic institution's evaluative decisions about its students. In *Horowitz*, a former medical student challenged her dismissal from the University of Missouri-Kansas City Medical School, claiming the school had not provided her procedural due process.[28] The student was dismissed during her final year of study for failure to meet academic standards.[29] Several faculty members opined that the student's clinical performance during a pediatrics rotation was below that of her peers. This led to two rounds of negative evaluations by the Council on Evaluation, a body of faculty and students that routinely and periodically evaluate all the performance of all students. The student's clinical performance was later evaluated by a group of well-regarded practicing physicians, who also gave her negative ratings. This led to the Council recommending her dismissal, a

---

education that entitled him to due process); *Byrnes v. Johnson Cnty. Cmty. Coll.*, No. 10-2690-EFM-DJW, 2011 WL 166715, at *1–2 (D. Kan. Jan. 19, 2011) ("Defendants argue that Plaintiff has no constitutionally protected property interest in her post-secondary education, but the law is clearly otherwise.").

[27]435 U.S. 78 (1978).

[28]*Id.*

[29]*Id.* at 79.

16

recommendation adopted by the Dean. The student appealed this action to the Provost, who sustained the dismissal after reviewing the record.[30]

The Supreme Court held that the school provided sufficient due process in that it "fully informed respondent of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment. The ultimate decision to dismiss respondent was careful and deliberate."[31] The Court also noted that there was no requirement that the school grant the student a hearing before dismissing the student on academic grounds; and that this level of protection for academic dismissals was consistent with sixty years of court decisions, including the Tenth Circuit's decision in *Gaspar v. Bruton*.[32]

Consistent with *Gaspar*, the Tenth Circuit more recently held in *Trotter v. Regents University of New Mexico*,[33] that a dismissed medical student was accorded due process where she was given prior notice of the faculty's dissatisfaction with her poor academic performance, and that although the student did not have a hearing, the number of appeals and review hearings conducted by the school, showed that the school's decision was careful and deliberate.[34] In *Trotter*, the student had twice been expelled but reinstated, leading to a third dismissal that she challenged in the subject lawsuit. The process accorded for that third dismissal included the

---

[30]*Id.* at 80–82.

[31]*Id.* at 84–85 (the Court assumed the student had a liberty interest in her continued enrollment; the student did not claim to have a property interest in such).

[32]*Id.* at 87–88 (citing *Gaspar v. Bruton*, 513 F.2d 843, 851 (10th Cir.1975) (holding that procedural due process was accorded when the school had advised the nursing student of her deficiencies and the failure or impending failure to meet standards)).

[33]219 F.3d 1179, 1185 (10th Cir.2000).

[34]*Id.*

17

medical school dean giving the student two-weeks notice that she was not meeting the conditions of her probationary reinstatement before expelling her for poor academic performance. The dean's decision was reviewed and upheld by the university president, whose decision was reviewed and upheld by the university's board of regents. The student did not participate in any hearing.[35]

Consistent with the instruction and directives in these Supreme Court and Tenth Circuit decisions, which were clearly established law at the time of Plaintiff's dismissal, this Court concludes that Plaintiff was accorded an appropriate level of due process. Although she did not have a hearing, she was aware that she could not complete her dissertation work and graduate without the supervision of a major professor. Drs. Neill and Guikema and others repeatedly reminded her of the critical need to obtain a major professor. Dr. Neill communicated the urgency of this requirement by giving her a deadline after she failed to respond to his email asking her for updates. When Plaintiff failed to communicate with Dr. Neill by the deadline or even thereafter, Dr. Neill and Guikema and others repeatedly told her that she needed a major professor and having failed to obtain one within the Statistics Department, she needed to seek such in another graduate program. Plaintiff was given notice of the deficiency— lack of a major professor—and the consequence, dismissal from the Statistics Department— and dismissal from the Graduate School if she failed to obtain a major professor in another graduate program. But Plaintiff refused the final option of seeking another graduate program, and failed to obtain a major professor in the Statistics Department before, or even after, the deadline.

---

[35]*Id.* at 1181–82.

18

Moreover, the process employed by the Statistics Department and Graduate School demonstrates that their decision to dismiss Plaintiff was careful and deliberate. After the first grievance, Dr. Neill volunteered to serve as co-major professor with Dr. Wang, so Plaintiff could continue to work with Dr. Wang. When Plaintiff sought removal of Dr. Wang through a second grievance, Dr. Neill, whose research area was different than Plaintiff's, directed Plaintiff to solicit a new major professor within the Statistics Department. When Plaintiff failed to communicate with him or accomplish that, Dr. Neill and the other Statistics faculty met to discuss Plaintiff's situation. Next, the Statistics Department SPC convened, not just to consider Plaintiff, but to consider the progress of other students, and determined that Plaintiff's lack of a major professor signified that she was not making satisfactory progress. Dr. Neill was not involved in this committee; Dr. Higgins, the chair of the SPC reported the committee's finding to Dr. Neill on April 20. From April 20 to April 27, Dr. Neill continued to encourage Plaintiff to seek another major professor in the Statistics Department. After the April 27 deadline passed, Drs. Neill, Guikema and Crawford began urging Plaintiff to seek another graduate program. But not until May 8, did Dr. Neill ask the SPC to make a formal decision; and on May 8, the SPC recommended Plaintiff's dismissal. Dr. Neill then communicated the SPC's recommendation to the Graduate School; and two days later, Dr. Guikema gave Plaintiff notice of the recommendation and the impending dismissal, while also giving her a six week window to find another graduate program at KSU. When Plaintiff advised the Graduate School on May 30 that she had decided not to transfer to another graduate program, only then, on May 31, was she dismissed from the Graduate School. This process illustrates that Plaintiff's dismissal was the

19

produce of careful deliberation by the Statistics faculty, the SPC, and the Graduate School, and only after giving Plaintiff opportunities and alternatives to dismissal.

Moreover, for purposes of applying qualified immunity, the Court must conduct a differentiated analysis of each defendant, not just cumulatively, as the Court has discussed above. In conducting a differentiated analysis, the Court asks whether Plaintiff can show facts or issues of fact concerning whether *each* defendant caused her to be subjected to a violation of her due process rights.[36] A plaintiff must show that "clearly established law would advise reasonable decisionmakers that the [ ] process *and their role in it*" as alleged "transgressed clearly established constitutional rights."[37] To make out a viable § 1983 claim and to overcome Movants' assertions of qualified immunity, Plaintiff "must establish that each defendant—whether by direct participation or by virtue of a policy over which he possessed supervisory responsibility—caused a violation of [P]laintiff's clearly established constitutional rights."[38]

The uncontroverted facts show that Dr. Neill: (1) agreed to serve as co-major professor after Plaintiff's first grievance against Dr. Wang; (2) after the second grievance against Dr. Wang, removed himself as a co-major professor on a change form that Plaintiff signed and approved; (3) gave Plaintiff notice that to satisfactorily progress, she needed to find another major professor in the Statistics Department and gave her twenty-two days to do so; (4) continued to remind Plaintiff of her responsibility and the deadline to find another major

---

[36] *Pahls v. Thomas*, 718 F.3d 1210, 1231 (10th Cir. 2013) (citation omitted)..

[37] *See Riggins v. Goodman*, 572 F.3d 1101, 1115 (10th Cir. 2009) (citations omitted) (emphasis added).

[38] *Pahls*, 718 F.3d at 1228.

professor; (5) allowed Plaintiff to retain her same dissertation topic, despite the Statistics Department policy that provided that it be relinquished to Dr. Wang; (6) asked for a formal decision from the SPC Committee on May 8, eleven days after the deadline; and (7) recommended dismissal from the Statistics Department, based on the vote of the SPC. Dr. Neill never acted unilaterally. And, other than providing Ms. Reed with background information about Plaintiff's matriculation and status, Dr. Neill did not participate in the CIRT process that culminated in a finding of no disciplinary action.

The uncontroverted facts also show that Dr. Guikema: (1) followed Dr. Neill in expressly permitting Plaintiff to retain her dissertation topic with a new major professor; (2) informed Plaintiff on May 1, some four days after the April 27 deadline, that she needed to seek opportunities in other departments of the Graduate School, since she had almost no chance to continue with a major professor in the Statistics Department; (3) met with Plaintiff on May 7 to discuss her options given her imminent dismissal from the Statistics Department; (4) advised Plaintiff after the May 7 meeting that she would likely be terminated from the Graduate School because the Statistics Department was going to recommend termination; (5) on May 11 advised Plaintiff that the Statistics Department had recommended dismissal, but that the Graduate School would give Plaintiff six weeks to find another program to continue her Ph.D. matriculation, and further encouraged Plaintiff to keep him posted and assured her that this was confidential and that he would not share this information with anyone; and (6) warned her that he would no longer serve as her advisor if she continued to contact faculty in the Statistics Department instead of following his advice to seek a graduate program in another department. Dr. Guikema did not act unilaterally, but upon the recommendation of the Statistics Department, as is

21

standard. Dr. Guikema, like Dr. Neill, ignored the policy that dictated that Dr. Wang would retain Plaintiff's research, adopting leniency in allowing Plaintiff to continue with that research if she could find another major professor. Dr. Guikema further granted lenience and grace in allowing Plaintiff six weeks after May 11 to continue to seek another major professor outside of the Statistics Department. And, Dr. Guikema was not at all involved in the CIRT process.

In short, while Plaintiff has established a constitutionally protected property interest in her continued matriculation in graduate school, she has utterly failed her burden of showing that either Defendant denied her procedural due process before her academic dismissal from Graduate School. She was given repeated notice of the deficiency and its consequences, as well as time to fix the deficiency. The dismissal was the product of careful deliberation by faculty, the SPC and the Graduate School. As the Supreme Court instructed in *Horowitz*, the Court necessarily gives deference to the academic decision makers in the institution and their "expert evaluation of cumulative information" that is "not readily adapted to the procedural tools of judicial or administrative decisionmaking,"as "[s]uch a judgment is by its nature more subjective and evaluative than the type of typical factual questions presented in the average disciplinary decision."[39]

While Defendants accorded Plaintiff sufficient procedural due process under the clearly established law, it bears noting, that Plaintiff could have filed a grievance at any time after she was on notice of the need to obtain another major professor. She certainly could have filed a grievance when she was placed on notice of the Statistics Department recommendation for dismissal, or when she was given notice that the Graduate School would dismiss her, after a six

_____

[39]*Horowitz,* 435 U.S. at 90.

22

week grace period. Had Plaintiff filed a grievance, a process she was well aware of having

previously filed two grievances against Dr. Wang, under KSU's procedures she may have

received more process.[40]

Similarly, while doing nothing to institute or employ KSU's process to challenge

disciplinary dismissals, Plaintiff now claims that her dismissal was for disciplinary, not academic

reasons. Plaintiff characterizes her dismissal as behavioral, rather than academic, because

according to Plaintiff, she had an excellent academic record. But her emphasis on her academic

accomplishment misses the mark, for Plaintiff's lack of a major professor late in her Ph.D.

candidacy prevented her from making the requisite academic progress.

Moreover, the Court rejects this argument because the uncontroverted facts show that the

dismissal was academic, not disciplinary. Though the CIRT process was employed after the

May 2 incident, it quickly terminated on May 4, with a finding that no disciplinary action was

warranted. To be sure, Ms. Reed, who was involved in the CIRT process, emailed Dr. Crawford

on May 2 and told him that she and Dr. Neill had discussed Plaintiff's separation from the

university as prudent based on her erratic, aggressive behavior. But there is no evidence that Dr.

Neill, Dr. Guikema, the SPC, or ultimately the Graduate School, proceeded with a process that

resulted in Plaintiff's dismissal because of the May 2 incident. Rather, in every communication,

including the formal recommendation and formal dismissal, Plaintiff's dismissal was premised

---

[40] Although there is no showing that KSU failed to follow its own more formal grievance procedures, even with a such a showing, that would not change the Court's analysis that Plaintiff actually received sufficient procedural due process. *See Trotter v. Regents of Univ. of N.M.*, 219 F.3d 1179, 1185 (10th Cir. 2000) (noting that even if the medical school failed to follow its own procedural protections and even if those protections were greater than what the student received, that failure would not give rise to a constitutional claim under the Fourteenth Amendment; rather the constitutional claim is based on whether the procedures actually provided accord sufficient procedural due process).

23

on her failure to satisfactorily progress academically, because she had no major professor to supervise her dissertation work.

Furthermore, even if this Court found that the dismissal on academic grounds was pretextual and the real basis was disciplinary, the Court would still conclude that Defendants had not violated Plaintiff's right to procedural due process before dismissal. Although academic decisions about a student are entitled to greater deference than disciplinary decisions and the procedural requirements for academic dismissals are less stringent than those for disciplinary actions,[41] even under the standards for disciplinary dismissals, Plaintiff was afforded sufficient procedural due process. For, with respect to disciplinary dismissals, the Supreme Court has instructed due process requires "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."[42] Here, Plaintiff was repeatedly given oral and written notice that she needed to find another major professor, because she could not progress academically without one. Plaintiff does not deny that she lacked a major professor; and she does not deny that she needed one. Thus, even under the process necessary for a disciplinary dismissal, there was no need to proceed with explanations, or Plaintiff's presentation with her side of the story. And, with respect to the May 2 incident, it ended with a finding of no disciplinary action, in other words, no charges, such that there was no need for further process on that basis.

---

[41] *Horowitz*, 435 U.S. at 86.

[42] *Id.* (quoting *Goss v. Lopez*, 419 U.S. 565, 584 (1975)).

24

Finally, although Plaintiff's behavior on May 2 may have been considered by Dr. Neill,

and perhaps others, there is no indication that the SPC or Graduate School considered the

incident. But even if the May 2 incident was considered by the decision makers, that does not

transform an academic process into a disciplinary process. In *Horowitz*, the faculty determined

that the student's clinical performance was unsatisfactory, and part of their evaluation concerned

her lack of "critical concern for personal hygiene,"[43] a behavior not directly related to her

academic performance. Yet, the process was still deemed an academic, not disciplinary process.

## IV.    Conclusion

Given that Defendants have raised qualified immunity, as discussed above, the burden is

initially on Plaintiff to show that these defendants have violated her constitutional rights by

depriving her of procedural due process. Plaintiff has failed her burden of demonstrating this.

Defendants afforded Plaintiff more than the required level of due process for an academic

dismissal, or even a disciplinary dismissal, based on the clearly established law at the time of her

dismissal. Thus, Plaintiff has failed to meet her initial burden, and Defendants Neill and

Guikema are entitled to qualified immunity and judgment as a matter of law.

Even if Plaintiff met her burden, however, and the burden shifted to Defendants to

demonstrate their entitlement to judgment as a matter of law pursuant to Rule 56, Defendants

have met that burden. Based on the uncontroverted facts detailed above, Defendants easily

establish that they are entitled to judgment because they did not deprive Plaintiff of her

constitutional right to procedural due process, and thus did not violate 42 U.S.C. § 1983.

---

[43]*Id.* at 81.

25

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants Neill and

Guikema's Motion for Summary Judgment (Doc. 67) is **GRANTED**.

**IT IS FURTHER ORDERED BY THE COURT** that Plaintiff's Motion for Leave to

File a Surreply Memorandum (Doc. 77) is **GRANTED**.

**IT IS FURTHER ORDERED BY THE COURT** that Defendants' Motion to Strike

Surreply (Doc. 78) is **DENIED**.

**IT IS SO ORDERED**.

Dated: July 23, 2015

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

26

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

GRACE LEE

                    Plaintiff,

                                                CIVIL ACTION

v.

                                                No. 12-2638-JAR

DR. CAROL W. SHANKLIN, et al

                    Defendants,

---

## JUDGMENT

This action came before the Court.  The issues have been considered and a decision has been rendered.

**IT IS ORDERED BY THE COURT** that pursuant to the Memorandum and Order filed and entered on July 23, 2015 (Doc. 81), Defendants Neil and Guikema's Motion for Summary Judgment (Doc. 67) is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to File a Surreply Memorandum is (Doc. 77) is **GRANTED.**

**IT IS FURTHER ORDERED BY THE COURT** that Defendants' Motion to Strike Surreply (Doc. 78) is **DENIED.**

IT IS SO ORDERED.

Dated: July 23, 2015.

s/ Bonnie Wiest

By Deputy Clerk
TIMOTHY M. O'BRIEN
Clerk of the District Court