Case No. 15-3189

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

### GRACE LEE

**Plaintiff - Appellant,**

v.

### DR. JAMES GUIKEMA and DR. JAMES W. NEILL,

**Defendants - Appellees.**

---

**On Appeal from the United States District Court for the District of Kansas**
**The Honorable Julie A. Robinson**
**D.C. No. 12-CV-2638-JAR-TJJ**

---

### BRIEF OF APPELLEES

---

OFFICE OF ATTORNEY GENERAL
DEREK SCHMIDT

s/ M.J. Willoughby
M.J. Willoughby, KS No. 14059
Assistant Attorney General
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Tel:  (785) 296-2215
Fax:  (785) 291-3767
Email:  MJ.Willoughby@ag.ks.gov
*Attorney for Appellees*

ORAL ARGUMENT NOT REQUESTED

# **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ........................................................................ 1

INTRODUCTION TO THE CASE ON APPEAL............................................... 1

STATEMENT OF THE ISSUE .......................................................................... 2

STATEMENT OF THE CASE ........................................................................... 2

STANDARD OF REVIEW ............................................................................... 17

SUMMARY OF ARGUMENT ......................................................................... 18

    I.       Qualified Immunity Provides A High Protective Standard ........................ 19

    II.     Lee Failed To Meet Her Burden Of Coming Forth With Case Law
            Showing That Dr. Neill Or Dr. Guikema Were On Notice That A
            Different Process Was Required For Dismissals For Lack Of A
            Major Professor Or Failure To Make Academic Progress ........................ 22

    III.    Lee Received Sufficient Process For Her Academic Dismissal ............... 23

    IV.    Lee's Speculations Do Not Convert An Academic Dismissal Into A
            Disciplinary One; Lee Also Failed To Utilize The Grievance Process
            To Challenge Her Dismissal Or To Put The University On Notice
            That She Believed A Different Process Was Required ............................. 31

CONCLUSION ................................................................................................. 37

CERTIFICATE OF COMPLIANCE ................................................................. 38

CERTIFICATE OF PRIVACY REDACTIONS................................................ 38

 CERTIFICATE OF DIGITAL SUBMISSIONS............................................... 38

CERTIFICATE OF SCANNING ..................................................................... 38

CERTIFICATE OF SERVICE ......................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

*Cases*

*Alexander v. Kennedy-King College,* No. 88 C 2117, 1990 WL 179691, *6 (N.D. Ill. Nov. 2, 1990) ........................................................................................ 36

*Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2083 (2011) .................................... 20

*Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) ................................. 19

*Board of Curators of University of Missouri v. Horowitz,* 435 U.S. 78 (1978) ..................
.......................................................................... 18, 22, 23, 24, 25, 30, 31, 34, 36

*Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577 (1972) ) ........................ 25

*Brown v. University of Kansas*, 16 F. Supp. 3d 1275, 1289 (D. Kan. 2014), *aff'd,*
559 Fed. Appx. 833 (10th Cir. 2015) .................................................................. 34

*Brown v. University of Kansas*, 559 Fed. Appx. 833 (10th Cir. 2015) ............................ 35

*Gaspar v. Bruton,* 513 F.2d 843, 851 (10th Cir. 1975) ...................................................... 24

*Hardman v. Johnson County Community College,* No. 13-2535-JTM, 2014 WL
1400668, at ** 4-5 (D. Kan. April 10, 2014) ...................................................... 35

*Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ...................................................... 37

*Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 325 (10th Cir. 1984)........................... 37

*Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 485 (1982) ........................................ 36

*Lane v. Franks*, 573 U.S. ____, 134 S. Ct. 2369 (2014) ...................................... 20

*Mauriello v. University of Medicine and Dentistry,* 781 F.2d 46, 51 (3d Cir. 1986),
*cert. denied,* 479 U.S. 818 (1986) ...................................................... 28

*Morris v. Noe,* 672 F.2d 1185, 1196 (10th Cir. 2012)........................................................ 20

*Pahls v. Thomas,* 718 F.3d 1210, 1227 (10th Cir. 2013) .................................................. 20

*Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225-28 (1985) ..................... 30

*Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) ........................................................ 20

*Rojas v. Anderson*, 727 F.3d 1000, 1003 (10th Cir.), *cert. denied,* 134 S. Ct. 800 (2013) ............................................................................................................. 17, 19, 20

*Stanton v. Sims,* 571 U.S. ____, 134 S. Ct. 3 (2013) ...................................................... 21

*Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010) ............................................. 20

*Trotter v. Regents of University of New Mexico,* 219 F.3d 1179 (10th Cir. 2000) ........... 24

*Wood v. Moss*, 572 U.S. ____, 134 S. Ct. 2056, 2067 (2014) ......................................... 21

### *Secondary Authorities*

S. Milam & R. Marshall, "Impact of Regents of the University of Michigan v.

Ewing on Academic Dismissals from Graduate and Professional Schools," 13 J.C.

& U.L. 335 (1987) ........................................................................................................... 30

## JURISDICTIONAL STATEMENT

Appellant's jurisdictional statement is sufficient.  Fed. R. App. P. 28.

## INTRODUCTION TO THE CASE ON APPEAL

Grace Lee was dismissed from the Graduate School at Kansas State University for failure to make satisfactory progress toward her Ph.D. in Statistics – an academic dismissal.  To make progress toward a Ph.D., which is based upon the University's judgment that a student's dissertation makes a unique contribution to knowledge in the field, a graduate student must have a major professor to guide, supervise, and evaluate the student's research and dissertation.  Despite being warned on multiple occasions that she needed a major professor to make progress toward the Ph.D., Lee sought and obtained the removal of her major professor, Dr. Haiyan Wang.  This left her without a major professor and rendered her unable to make academic progress toward her Ph.D.

No other faculty member in the Statistics Department had the expertise necessary for Lee's specific research topic and no faculty member in the Statistics Department agreed to serve as Lee's major professor.  And despite numerous suggestions that she look to other departments in the Graduate School, Lee refused to do so.

In a thorough and well-reasoned opinion, the District Court through the Honorable Julie A. Robinson of the District of Kansas properly granted Dr. Neill's and Dr. Guikema's motion for summary judgment based upon qualified immunity, finding that Lee failed to meet her burden of demonstrating a procedural due process violation and also finding that Lee had been afforded "more than the required level of due process for

1

an academic dismissal or even a disciplinary dismissal, based on the clearly established law at the time of her dismissal." Mem. and Order filed 7/23/15 (Doc. 81), R. Vol. II, at 582.

The District Court also correctly ignored Lee's contrived arguments that her dismissal was about something other than her admitted lack of a major professor. The District Court found that Lee had no admissible evidence supporting her allegations, and that her allegations were contradicted by all of the other evidence in the record.

## STATEMENT OF THE ISSUE

Did the District Court err in granting summary judgment to Kansas State University officials Dr. James W. Neill and Dr. James A. Guikema where Lee failed to meet her heavy two-part burden in opposing summary judgment based upon qualified immunity, including that Lee failed to show that clearly established law required a different process for her dismissal from the Ph.D. program in Statistics at the Kansas State University Graduate School for failure to make academic progress given her admitted lack of a major professor to supervise her dissertation research and also where Lee failed to show that her procedural due process rights were violated in any event?

## STATEMENT OF THE CASE

Grace Lee was admitted to the Graduate Program in Statistics at Kansas State University in 2006. Verified Complt. filed 9/28/12 at ¶ 22 (Doc. 1), R. Vol. I, at 17. Upon admission, she received a letter informing her of the Graduate School's requirement that graduate students are responsible for diligent pursuit and timely

completion of all responsibilities associated with progress toward a degree.  The letter
also contained a citation to the website containing the Graduate Handbook and other
graduate school documents and asked that she review these materials. Declaration of Dr.
Carol W. Shanklin ("Shanklin Declaration"), at ¶¶ 5-6; Graduate School Admission
Letter dated December 5, 2005, attached as Exhibit B to Shanklin Declaration (Doc. 68-
1), R. Vol. I, at 582, 656.[1]   The Graduate Handbook includes the statement that graduate
students are denied continued enrollment if they fail to maintain satisfactory progress
toward a graduate degree. Shanklin Declaration at ¶¶ 3, 7, Shanklin Exhibit A, Graduate
Handbook, 2-7, 3-7 (Doc. 68-1), R. Vol. I, at 582-83, 585, 605, 616.   Dismissals for
failure to make academic progress and for other academic reasons are processed through
the Graduate School; disciplinary dismissals are processed through other offices at KSU.
Shanklin Declaration, at ¶ 14 (Doc. 68-1), R. Vol. I, at 584.

    The Statistics Department also has a Graduate Handbook which states that each
student seeking a Ph.D. must conduct dissertation research under a major professor.
Plaintiff's Response to Defendants' First Request for Admission No. 27 (Doc. 68-20), R.
Vol. I, at 718.  A dissertation must make an original contribution to knowledge in the
student's chosen field.  Shanklin Declaration, at  ¶ 8 (Doc. 68-1), R. Vol. I, at 583.  The
major professor often helps the student with the idea or refining the idea for the

---

[1] All references to evidentiary materials  (other than a single reference to one of Plaintiffs'
summary judgment submissions), are references to materials filed in support of
Defendants' Motion for Summary Judgment as attachments to the Memorandum thereto,
filed on December 5, 2014 and included in the record as Docket No. 68.

dissertation research project, which is related to the major professor's area of research. Neill Declaration, at ¶¶ 10-11 (Doc. 68-6), R. Vol. I, at 662. Serving as a major professor is a substantial commitment of time and expertise. Shanklin Declaration, at ¶ 11 (Doc. 68-1), R. Vol. I, at 584. The Statistics Department has a policy that the dissertation topic remains with the major professor if the student fails to make sufficient progress. Declaration of James W. Neill ("Neill Declaration"), at ¶¶ 10-11 (Doc. 68-6), R. Vol. I, at 662; Statistics Department Handbook, R. Vol. I, at 679. It is the responsibility of the graduate student to find a major professor who is willing and able to enter into a mentorship relationship with the student in an area of mutual research interest. Shanklin Declaration, at ¶ 10 (Doc. 68-1), R. Vol. 1, at 583

In the Statistics Department, students are expected to make adequate progress in the program – in most cases, two years to complete the M.S. degree, and four years beyond the M.S. to complete the Ph.D. degree. Statistics Department Handbook 2011-2012 edition, at 6, 9 (hereafter "Department Handbook"), attached as Exhibit A to Declaration of Dr. James W. Neill ("Neill Declaration"), ¶ 3 (Doc., 68-6), R. Vol. I, at 661, 676, 679. In the Statistics Department, student progress is reviewed by the Department's Student Progress Committee each year. Department Handbook, at 6, 9, Neill Exhibit A; Neill Declaration, at ¶ 5 (Doc. 68-6), R. Vol. I, at 661, 676, 679. The Graduate Student Progress Committee makes a list of students every semester who it determines are not making satisfactory progress towards completion of a degree. Department Handbook at 9, § 5; Neill Declaration, at ¶ 6 (Doc. 68-6), R. Vol. I, at 661,

679.  Graduate students in the Department of Statistics who fail to make satisfactory progress will lose departmental support and will be recommended for dismissal from the Graduate School.  Department Handbook, at 9, § 5; Neill Declaration, at ¶ 7 (Doc. 68-6), R. Vol. I, at  661, 679.  The Departmental Handbook advises students:  ". . . at the discretion of the major professor and/or supervisory committee, if sufficient progress is not being made on a degree research topic then the student must relinquish the research topic for degree purposes." Department Handbook, at 9, § 5; Neill Declaration, at ¶ 8 (Doc. 68-6), R. Vol. I, at 662, 679.

Lee received a copy of the Department of Statistics Handbook, had access to it, and had access to Graduate School Policies and Procedures.  Plaintiff's Response to Defendants' First Request for Admissions Nos. 9-11 (Doc. 68-20), R. Vol. I, at 716.  Lee was aware that graduate students in the Statistics Department were required to make progress toward degree completion. Plaintiff's Response to Defendants' First Request for Admission No. 44 (Doc. 68-20), R. Vol. I, at  721.  Lee admits that she could not obtain a Ph.D. from Kansas State University without a major professor to supervise her research on her chosen dissertation topic.  Plaintiff's Response to Defendants' First Requests for Admission No. 26 (Doc. 68-20), R. Vol. I, at  718.

In the Fall of 2011, Lee complained to Dr. Neill about Dr. Haiyan Wang, her major professor.  Neill Declaration at ¶ 15 (Doc. 68-6), R. Vol. I, at 663.  On or about September 21, 2011, Dr. Carol Shanklin, Dean of the Graduate School, was contacted by Lee.  Dr. Shanklin told Lee that if she wanted to stop working with Dr. Wang as her

major professor, then Lee would have to find another major professor or she could no longer be a graduate student. Shanklin Declaration, at ¶ 15 (Doc. 68-1), R. Vol. I, at 584. Dr. Shanklin also informed Lee that changing major professors could result in needing to change her research topic to match the expertise of the new major professor.  Shanklin Declaration, at ¶ 16 (Doc. 68-1), R. Vol. I, at 584.  Lee's dissertation topic, entitled, "Hypothesis Testing on Correlated Heteroscedastic High-Dimensional Matrix Data with Limited Replications," was related to and a continuation of Dr. Wang's dissertation. Neill Declaration, at ¶ 12 (Doc. 68-6), R. Vol. I, at 662.  Dr. Wang was the only faculty member in the Statistics Department whose expertise involved Lee's chosen topic which involved an area of Statistics research that was at that time on the cutting edge, specialized, complex and narrow. Neill Declaration, at ¶ 26 (Doc. 68-6), R. Vol. I, at 665. Declaration of Joseph Aistrup, at ¶ 7 (Doc. 68-21), R. Vol. I, at 723 (at the time, this work was "cutting edge," "a very specialized area of statistics").

In that time frame, around September 29, 2011, Dr. Neill also met with Lee and informed her of her options.  Neill Declaration, at ¶¶ 17-18  (Doc. 68-6), R. Vol. I, at 663-64.  These options are reflected in an email dated September 29, 2011. Those options included:

1. Consider the suggestions of Drs. Gadbury and Song and return to work with Dr. Wang to complete the prelim, with the expectation of finishing her PhD under Dr. Wang's supervision.

2. Disengage work with Dr. Wang and seek another major professor in the department with the understanding that the work accomplished to date and the research topic would remain with Dr. Wang i.e. start anew with another faculty

6

member and another research topic.  This would be consistent with stated department policy.

3. File a grievance against Dr. Wang and proceed according to the Graduate School process for such.

4. Terminate from the Statistics graduate program (Grace has previously earned an MS from the department).

Neill Declaration, at ¶¶ 17-18; Neill Exhibit B (Doc. 68-6), R. Vol. I, at 663-64.

Dr. Shanklin advised Lee of the Graduate Students Rights and Grievance Procedure in Appendix A of the Graduate Handbook, explained the process, provided her a copy of Appendix A and advised her to schedule an appointment with an Associate Dean if she wished to proceed on the grievance.  Shanklin Declaration, at ¶¶ 17-18 (Doc. 68-1), R. Vol. I, at  584-85.

The first step in the process of grievance resolution is dispute resolution; Dr. Joseph Aistrup was asked to see if Lee's grievance against Dr. Wang could be resolved informally.  Shanklin Declaration, at ¶ 19 (Doc. 68-1), R. Vol. I, at 585; Declaration of Dr. Joseph Aistrup ("Aistrup Declaration"), at ¶ 4 (Doc. 68-21), R. Vol. I, at 723.   Dr. Aistrup informed Lee that she needed a major advisor, that Dr. Wang was the most suitable person for this role, and that to change major advisors would require Lee to change topics.  Aistrup Declaration, at ¶¶ 5-6 (Doc. 68-21), R. Vol. I, at 723.  Dr. Aistrup also told Lee that she also had the option of going elsewhere.  Aistrup Declaration, at ¶ 9 (Doc. 68-21), R. Vol. I, at  724.

In the Fall of 2011, as a resolution of Lee's proposed grievance against Dr. Wang, Dr. Neill agreed to serve as a co-major professor along with Dr. Wang in an attempt to

facilitate between Lee and Dr. Wang and to allow Lee to make progress on her

dissertation proposal.  Verified Complt. filed 9/28/12 at ¶¶ 41-42 (Doc. 1), R. Vol. I, at

19; Aistrup Declaration, at ¶¶ 10- 13; Aistrup Exhibit A (Doc. 68-21), R. Vol. I, at 724-

25.  Dr. Aistrup followed up in an email to Lee on November 8, 2011, reiterating that

"Professor Neill is the co-advisor, mediating between you and Dr. Wang.  He is not an

expert on your topic, Dr. Wang is.  Dr. Neill is not there to substitute for Dr. Wang's

undeniable expertise."  Aistrup Declaration, at ¶¶ 10-11; Aistrup Exhibit A (Doc. 68-21),

R. Vol. I, at 724-25.

     As of January 2012, Lee had still not been able to complete a satisfactory literature

review for her dissertation proposal.  Lee admits that she had been working on the

literature review for a long time, at least 1.5 years.  Defendants' Answer, Exhibit 2 (Doc.

24-2),  ¶ 1, R. Vol. I, at 243.   Lee had been working on her doctoral dissertation proposal

since at least Winter 2010.  Plaintiff's Responses to Defendants' First Request for

Admission No. 43 (Doc. 68-20), R. Vol. I, at 720.

     On March 18, 2012, Lee filed a grievance with its stated objective being removal

of Dr. Haiyan Wang as her major professor.  Plaintiff's Response to Defendants' First

Request for Admissions No. 46 (Doc. 68-20), R. Vol. I, at 721; Neill Declaration, at ¶ 22;

Neill Exhibit C (Doc. 68-6), R. Vol. I, at 665, 691-94. The objective of Lee's March 18,

2012 grievance was approved and on April 4, 2012, Grace Lee and all of the members of

Lee's committee signed the Program/Committee Change Form removing Drs. Neill and

Wang.  Neill Declaration, at ¶ 23; Neill Exhibit D (Doc. 68-6), R. Vol. I, at 665, 695.

On April 9, 2012, Dr. Neill informed Lee that she was "free to find another professor within the department with which to work," but "[i]n order to track your academic progress, you will need to keep me informed as to which faculty is available and willing to supervise your work."  Verified Complt. filed 9/28/12 (Doc. 1), at Exhibit F, R. Vol. I, at 66; Neill Declaration, at ¶ 24; Neill Exhibit E (Doc. 68-6), R. Vol. I, at 665, 696-97.  Lee states that she sent emails to all twelve faculty members in the Department requesting that they serve as her major advisor, with the dates on the emails ranging from April 11 through April 15, 2012.  Pltf's Exh. 23 to Pltf's Resp. to Summary Judgment filed 1/9/15 (Doc. 72-4), R. Vol. II, at 149-173.[2]    On April 13, 2012, Dr. Neill informed the Department faculty of Lee's situation.  The faculty discussed the department's policy that research initiated and developed by a faculty member is the property of that faculty member and not the student; the consensus among the faculty was that if Lee found a new adviser, she would have to begin work on a new topic as per the policy.  Neill Declaration, at ¶ 29 (Doc. 68-6), R. Vol. I, at 666.  Lee refused to change topics from the topic she had been working on with Dr. Wang.  Plaintiff's Response to Defendants' First Request for Admissions Nos. 15, 17 (Doc. 68-20), R. Vol. I, at 717.

On April 19, 2012, the Graduate Student Progress Committee for the Department of Statistics, chaired by Dr. James Higgins, met and identified Grace Lee as one of two students who were not making academic progress.  Declaration of  Dr. James Higgins

---

[2] While the responses to Lee's emails are inadmissible as hearsay,  Lee's own emails showing that she contacted all the faculty members early in April are admissible against her as per Fed. R. Evid. 801(d)(2)(A).

9

(Doc. 68-13), at 700; Higgins Exhibit A, R. Vol. I, at 700, 701.  Summarized, since Lee

had asked for Dr. Wang to be removed as her major professor and did not have a major

professor, she could not take the preliminary examination and could not graduate.  *Id.*, at

700.  On April 20, 2012, the Committee reported its findings to Department Head Dr.

James W. Neill. Higgins Declaration at ¶ 6, Higgins Exhibit A (Doc. 68-13),  R. Vol. I, at

700, 701; Neill Declaration, at ¶ 27 (Doc. 68-6), R. Vol. I, at  666.

When Dr. Neill had not heard anything from Lee about getting another professor

in the Statistics Department to serve as her major professor, Dr. Neill sent her an April

19, 2012 email, again telling her that she needed to keep him informed about her

progress. Verified Complt. filed 9/28/12  (Doc. 1), at Exhibit G at 2-3, R. Vol. I, at 68,

Neill Declaration, at ¶ 25; Neill Exhibit E (Doc. 68-6), R. Vol. I, at 665, 696-97.  Dr.

Neill's April 19, 2012 email also gave Lee an April 27 deadline to let him know "whether

you have located another major professor (and which professor this is) to supervise your

research." *Id.*  On April 23, 2012, Dr. Neill sent Lee another reminder email that he was

looking forward to hearing from her by April 27, 2012.  Lee did not call or stop by after

that email to let Dr. Neill know of her progress, as requested. Neill Declaration, at ¶ 30;

Neill Exhibit E (Doc. 68-6), R. Vol. I, at 666, 696-97.

On or about April 30, 2012, Associate Dean of the Graduate School, Duane

Crawford, informed Lee that he didn't "see any alternative" to Lee starting her research

anew on another topic with another major professor, a suggestion Lee rejected.  Verified

Complt. (Doc. 1), at ¶¶ 54-57, R. Vol. I, at  21.   On May 1, 2012, Dr. James A. Guikema,

10

also an Associate Dean in the Graduate School, sent an email to Lee stating that her

chances of completing her Ph.D. in Statistics were "almost down to zero," and

encouraging her to seek opportunities in other Departments.  Verified Complt. (Doc. 1),

at  ¶¶ 60-61, Exhibit I, R. Vol. I, at  22, 72.

On May 2, 2012, Associate Director of Student Life Heather Reed received a

report that Lee had become extremely upset and disruptive in the Graduate School Office

and had to be escorted from the building.  This triggered the University's Critical

Incident Response Team ("CIRT") process.  Declaration of Heather Reed  (Doc.76-3), R.

Vol. II, at 512.  The CIRT assesses and coordinates a response to situations presented on

campus such as student death or significant trauma, serious student situations involving

medical or psychological concerns, or campus threats or emergencies that directly affect

the well being of students and the campus community.  Reed Declaration (Doc. 76-3), R.

Vol. II, at 511. After gathering information and meeting on May 4, the CIRT team

concluded that Lee did <u>not</u> appear to be dangerous and no disciplinary action was

warranted but that she should be warned about her disruptive conduct. Cite.  No

disciplinary action was initiated against Lee. Reed Declaration (Doc. 76-3), R. Vol. II, at

512.

On May 7, 2012, Lee met with Heather Reed, Dean of Student Life, and Dr.

Guikema.  Lee was told that remaining in the Statistics Department was not an option and

that she would be dismissed unless she were accepted into a different department in the

Graduate School.  Verified Complt. filed 9/28/12  (Doc. 1), at ¶¶ 70, 71, 74, 75, R. Vol. I,

at  23-24.   On or about May 7, 2012, Lee received a follow-up email from Dr. Guikema

stating "it was "likely" that the Graduate School would receive a communication from

the Department of Statistics recommending her dismissal from the Graduate School" for

lack of academic progress.  Verified Complt. (Doc. 1), at ¶ 79; Complt. (Exhibit L), R.

Vol. I, at 24-25, 78.

Lee was unwilling to change topics for her Ph.D. dissertation. Plaintiff's Response

to Defendants' First Requests for Admission No. 17 (Doc. 68-20), R. Vol. I, at 717.   Dr.

Wang was the only faculty member in the Statistics Department whose expertise involved

Lee's chosen topic, which involved an area of Statistics research that was at that time on

the cutting edge, complex, specialized and narrow.  Neill Declaration, at ¶ 26 (Doc. 68-

6), R. Vol. I, at 665. Lee did not ask any faculty member in the Statistics Department at

Kansas State University to supervise her dissertation topic on a topic other than the topic

she had been working on with Dr. Wang.  Plaintiff's Response to Defendants' First

Requests for Admission No. 15 (Doc. 68-20), R. Vol. I, at 717.

As of May 9, 2012, Lee had no major advisor to supervise her Ph.D. research on

her chosen topic. Plaintiff's Response to Defendants' First Request for Admission No. 1

(Doc. 68-20), R. Vol. I, at 715.

On May 9, 2012, Dr. Neill wrote to the Graduate School on behalf of the Statistics

Department and recommended that Lee be terminated from the Statistics graduate

program because she lacked a major professor: "I have consulted with the Graduate

Student Progress Committee in the Department of Statistics regarding the academic

12

progress of Grace Lee.  With no dissenting opinions, the committee and I are

recommending that the student be terminated from the Statistics graduate program.  This

decision has been made based on her failure to find a replacement major professor to

supervise her PhD research.  Dr. Haiyan Wang served as major professor until the student

filed a grievance with the objective of removing Dr. Wang.  This request was approved

by all concerned.  Grace has earned a MS in Statistics (2010) from the department, and I

understand that she will have the opportunity to explore discussions with related graduate

programs."  Verified Complt. (Doc. 1), Exhibit M, R. Vol. I, at 80; Neill Declaration  at

¶ 32 (Doc. 68-6), R. Vol. I, at 667.   Dr. Neill had never been informed by anyone that the

law required a formal hearing or any particular process before a recommendation could

be made that a student be dismissed for failure to make academic progress.  Neill

Declaration, at ¶ 34 (Doc. 68-6), R. Vol. I, at 667.

　　　　The Graduate School relies upon the Department's recommendation regarding

lack of academic progress and normally, the dismissal follows immediately upon the

Graduate School's receipt of the recommendation. Shanklin Declaration, at ¶ 12 (Doc.

68-1),  R. Vol. I. at 584; Guikema Declaration, at ¶ 6 (Doc. 68-15), R. Vol. I, at 703.

No hearings are required or held where dismissals are proposed for academic reasons,

such as failure to make academic progress.  Shanklin Declaration, at ¶ 13 (Doc. 68-1), R.

Vol. I, at 584; Guikema Declaration, at ¶ 7 (Doc. 68-15), R. Vol. I, at 703.   By contrast,

dismissals for non-academic reasons, such as violation of the KSU Student Code of

Conduct, Honor & Integrity violations, discrimination or sexual violence, or violations of

the Threat Management Policy are not processed by the Graduate School, but rather by other offices.  Shanklin Declaration, at ¶ 14 (Doc. 68-1), R. Vol. I, at 584; Shanklin Exhibit D. Failure to have a major advisor is not listed in the Kansas State University Student Code of Conduct as a ground for discipline. Plaintiff's Response to Defendants' First Request for Admission No. 50, R. Vol. I, at 721.

In a May 11, 2012, email at 8:20 a.m. Dr. Guikema emailed Lee a copy of the Department's recommendation of dismissal and indicated to her that the Graduate School would not process the dismissal for one month "to allow you a 6 week window to find another program in which to be successful in your Ph.D. program." Guikema Declaration, at ¶ 8 (Doc. 68-15), R. Vol. I, at 703; Guikema Exhibit B, R. Vol. I, at 711.  In an email to Dr. Guikema at 1:24 p.m., Lee responded to his May 11, 2012 email:  "Though you have told me about the possible dismissal recommendation by the department, when it comes, I am still shocked.  I am grateful of you and Dr. Shanklin for giving me one month grace period. Thanks Grace."  Guikema Declaration, at ¶ 9 (Doc. 68-15), R. Vol. I, at 703; Guikema Exhibit B, R. Vol. I, at 711.   On May 11, 2012 at 4:26 p.m., Dr. Guikema sent another email to Lee stating:  "The most important thing that you should do with this one month period is to keep you[r] eye on the prize – finding a graduate program in which you will be successful.  It is never a good thing to hear bad news, no matter if it has been suggested to you before.  Please keep me posted on your efforts and to whom you are talking. Again – this is confidential information and I will not be sharing any information with  the people you contact.  But I need to know that you are

14

making progress.  One month is not a lot of time.  Best – jim."  Guikema Declaration, at ¶

10  (Doc. 68-15), R. Vol. I, at 703-04; Guikema Exhibit B, R. Vol. I, at 711.  At 5:08

p.m. on May 11, 2012, Dr. Guikema stated to Lee in another email:  "I have been telling

you for the last three weeks that my best advice is to contact people in other academic

programs.  This has not happened.  Yet again you are showing that you cannot take

advice.  I am close to telling you that I can no longer serve as an advisor to you, since at

every instance I get no positive action from you and, in fact, action which takes us back

several steps."  Verified Complt (Doc. 1), filed 9/28/12, Exhibit N, R. Vol. I, at 81.   On

May 30, 2012, Lee sent an email to Amanda Umscheid of the Graduate School stating

that it was her "formal decision" not to transfer to another Department of the Graduate

School.  Defs' Answer filed 7/10/13 (Doc. 24), R. Vol. I, at 227-40, Exhibit 4; Plaintiff's

Response to Defendants' First Request for Admission Nos. 6, 7 (Doc. 68-20), R. Vol. I,

at 716 ; Guikema Declaration, at ¶ 12 (Doc. 68-15), R. Vol. I, at 704; Guikema Exhibit C,

R. Vol. I, at 713.

As of May 31, 2012, Lee had no major advisor to supervise her Ph.D. research on

her chosen topic.  Plaintiff's Response to Defendants' First Request for Admission No. 2

(Doc. 68-20), R. Vol. I, at 715.  Prior to May 31, 2012, Lee did not ask any department at

Kansas State University, other than Statistics, to accept her into its graduate program.

Plaintiff's Response to Defendants' First Request for Admission No. 42 (Doc. 68-20), R.

Vol. I, at 720. On or about May 31, 2012, Dr. Guikema of the Graduate School signed the

letter dismissing Lee from the Graduate School.  In relevant part, the letter states:  "[t]he

15

Graduate School has received a recommendation that the Statistics graduate program that you be dismissed for failure to make satisfactory progress.  Based upon that recommendation, you are being dismissed from graduate study at Kansas State University.  Verified Complt. filed 9/28/12 (Doc. 1), Exhibit O, R. Vol. I, at 82; Guikema Declaration, at ¶ 13 (Doc. 68-15), R. Vol. I, at 704.   Dr. Guikema had never been informed by anyone that the law required a formal hearing or any particular process before a student could be dismissed for failure to make academic progress.  Guikema Declaration, at ¶ 15 (Doc. 68-15), R. Vol. I, at 705.

Lee did not file a formal grievance regarding her dismissal between March 18, 2012 and May 31, 2012.  Plaintiff's Response to Defendants' First Request for Admission No. 12 (Doc. 68-20), R. Vol. I, at 717.  Lee did not file a formal grievance regarding her dismissal after May 31, 2012.   Plaintiff's Response to Defendants' First Request for Admission No. 1 (Doc. 68-20), R. Vol. I, at 715.

If Lee had filed a formal grievance, she could have had a full hearing before an impartial committee, which included other graduate students.  Verified Complt. filed 9/28/12  (Doc. 1), at Exh. A, R. Vol. I, at 16; Shanklin Declaration, at ¶ 21 (Doc. 68-1), R. Vol. I, at 585. As part of the grievance process, Lee could have made opening and closing statements, submitted written documentation, called witnesses, used a hearing advisor, and obtained a court reporter.  Verified Complt. filed 9/28/12 (Doc. 1), at Exh.

16

A, R. Vol. I, at 14.   Lee did not file a petition for reinstatement.  Plaintiff's Responses to

Defendants' First Request for Admission No.14 (Doc. 68-20), R. Vol. I, at 717.[3]

## STANDARD OF REVIEW

Lee's Opening Brief (at xv) does not correctly state the standard of review of the

decision below, given Dr. Neill's and Dr. Guikema's qualified immunity defense.  As

stated in *Rojas v. Anderson*, 727 F.3d 1000, 1003 (10th Cir.), *cert. denied,* 134 S. Ct. 800

(2013), recited by the District Court below (Doc. 81 filed 7/23/15, R. Vol. II, at 559-60):

> "We review the district court's grant of summary judgment de novo, reviewing the
> evidence in the light most favorable to the nonmoving party." *Clark v. Edmunds,*
> 513 F.3d 1219, 1221–22 (10th Cir.2008) (internal quotation marks and brackets
> omitted). "However, because qualified immunity is designed to protect public
> officials from spending inordinate time and money defending erroneous suits at
> trial, we review summary judgment decisions involving a qualified immunity
> defense somewhat differently than other summary judgment rulings." *Id.* at 1222
> (internal quotation marks omitted). "When a defendant asserts a qualified
> immunity defense, the burden shifts to the plaintiff to satisfy a strict two-part test:
> first, the plaintiff must show that the defendant's actions violated a constitutional
> or statutory right; second, the plaintiff must show that this right was clearly
> established at the time of the conduct at issue." *Id.* (internal quotation marks

---

[3] As the District Court found below in considering Lee's Response to Defendants'
Motion for Summary Judgment, many of the factual allegations in Lee's "Statement of
the Facts," at pages 1-20 of her Opening Brief are based upon inadmissible hearsay, are
not supported by the record or are conclusory statements  and should be disregarded.
Mem. & Order filed 7/23/15 (Doc. 81), at 5, R. Vol. II, at 562.  As an example,
Paragraphs 28, 31, 32, 39, 40, 45, 54, 55, 56, 57, 58, 59, 61, 65 in the Opening Brief
contain inadmissible hearsay and are otherwise lacking in personal knowledge and cannot
be considered now as they could not on summary judgment. Contrary to Lee's
contention, the District Court did consider facts in the light most favorable to Plaintiff to
the extent possible.  Mem. & Order filed 7/23/15 (Doc. 81), at 5, R. Vol. II, at 562.

omitted). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted).


## SUMMARY OF ARGUMENT

Grace Lee was dismissed for failure to have a major professor to supervise her Ph.D. research and dissertation, an academic reason. As the District Court correctly found, Lee failed to meet her heavy two-part burden in overcoming Dr. Neill's and Dr. Guikema's motion for summary judgment based upon qualified immunity.

First, Lee failed to come forth with clearly established law which would have put Drs. Neill and Dr. Guikema on notice that proceeding in the manner they did on this academic dismissal, the manner in which all such dismissals had been handled at KSU and a manner in accordance with that stated by the U.S. Supreme Court in *Board of Curators of University of Missouri v. Horowitz,* 435 U.S. 78 (1978), was somehow illegal or unconstitutional.

Second, Lee failed to meet her burden to show that her procedural due process rights were violated in how this dismissal was handled.  Moreover, the District Court found that Lee had failed to meet her burdens in overcoming qualified immunity in such a manner that would require the usual summary judgment burden to shift to Drs. Neill and Guikema, that Dr. Neill and Dr. Guikema had more than met that burden.

Third, Lee's arguments lack support in the record, as she failed to come forth with admissible evidence in support of her allegations that her dismissal was for a reason other than her admitted lack of a major professor to supervise her Ph.D. research.  As the District Court found, the process provided was sufficient even under disciplinary dismissal standards.  Lee also failed to utilize the grievance process available to her to contest her dismissal and is barred from a due process claim as a matter of law.

The District Court's well-reasoned and thorough opinion and judgment in favor of Drs. Neill and Guikema must be affirmed by this Court on appeal.

## I.      Qualified Immunity Provides A High Protective Standard

As this Court has stated, there is a special standard for summary judgment motions based upon qualified immunity, beyond that of the usual summary judgment. *See, e.g., Rojas v. Anderson*, 727 F.3d 1000, 1003 (10th Cir. 2013) (citing *Clark v. Edmunds*, 513 F.3d 1219, 1221-22 (10th Cir. 2008)); *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (citing *Martinez v. Beggs,* 563 F.3d 1082, 1088 (10th Cir. 2009)).  "When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff to satisfy a strict two-part test:  first, the plaintiff must show that the defendant's actions violated a constitutional or statutory right; second, the plaintiff must show that this right was clearly established at the time of the conduct at issue.  If and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment – showing that there are no genuine issues of material fact and that he or she is

19

entitled to judgment as a matter of law." *Rojas,* 727 F.3d at 1003-04 (internal quotation marks and citations omitted).    "[O]fficials enjoy a presumption of immunity when the defense of qualified immunity is raised. . .. This standard, by design, 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Pahls v. Thomas,* 718 F.3d 1210, 1227 (10th Cir. 2013) (citations omitted).

"The plaintiff bears the burden of citing . . . what he thinks constitutes clearly established law." *Thomas v. Durastanti,* 607 F.3d 655, 669 (10th Cir. 2010).  To be clearly established, "existing precedent must have placed the statutory or constitutional question **beyond debate."** *Ashcroft v. al-Kidd,* 563 U.S. 731, 131 S. Ct. 2074, 2083 (2011); *Reichle v. Howards,* 132 S. Ct. 2088, 2093 (2012) (emphasis added). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Morris v. Noe,* 672 F.2d 1185, 1196 (10th Cir. 2012) (quotation omitted).    The U.S. Supreme Court recently reemphasized the high protective standard provided by qualified immunity in *Lane v. Franks*, 573 U.S. ____, 134 S. Ct. 2369 (2014), in affirming summary judgment for defendant Franks where clearly established law did not proscribe his actions, stating:

> Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'  *Ashcroft v. al-Kidd,* 563 U.S. 731, 131 S. Ct. 2074, 2085 (2011).  Under this doctrine, courts may not award damages against a government official in his personal capacity unless 'the official violated a statutory or constitutional right,' and 'the right was 'clearly established' at the time of the challenged conduct.'  131 S. Ct. at 2080.

Although the Supreme Court found that Lane's testimony was entitled to First Amendment protection (and the rulings below were incorrect), "because the question was not 'beyond debate' at the time Franks acted, *al-Kidd*, 563 U.S., at 731, 131 S. Ct. at 2083, Franks is entitled to qualified immunity." *Id.*, at 2383.  Other Supreme Court decisions this term were in accord with the highly protective standard for qualified immunity reiterated in *Lane. See, e.g., Wood v. Moss*, 572 U.S. ____, 134 S. Ct. 2056, 2067 (2014) (citations omitted) ("[r]equiring the alleged violation of law to be 'clearly established' balances . . . the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The 'dispositive inquiry,' . . . 'is whether it would have been clear to a reasonable officer' in the agents' position 'that [their] conduct was unlawful in the situation [they] confronted.'"); *Stanton v. Sims,* 571 U.S. ____, 134 S. Ct. 3 (2013) ) (finding the police officer was entitled to qualified immunity in a civil rights lawsuit asserting a Fourth Amendment claim where the law was not clearly established that a warrantless entry  to a home in hot pursuit of a suspect who an officer had probable cause to arrest for a misdemeanor, violated the Fourth Amendment).

Dr. Neill and Dr. Guikema handled Lee's dismissal for failure to make academic progress in a reasonable manner consistent with the way academic dismissals were handled by the Graduate School at Kansas State University. In response to their summary judgment motion, Lee failed to meet her burden of coming forward with a case on point

21

showing that their actions violated clearly established law of which they as reasonable

university officials would have known.  In fact, there is no such case.


**II.      Lee Failed To Meet Her Burden Of Coming Forth With Case Law
Showing That Dr. Neill Or Dr. Guikema Were On Notice That A
Different Process Was Required For Dismissals For Lack Of A Major
Professor Or Failure To Make Academic Progress**

In her Response to Summary Judgment filed on January 9, 2015 (Doc. 72), R. Vol.

II, at 72, *et seq.*, Lee identified no case law which would have put Dr. Neill on notice that

he was violating her clearly established procedural due process rights by recommending

her dismissal from the Statistics Department for failure to have a major professor.

Similarly, Lee identified no case law which would have put Dr. Guikema on

notice that he was violating her clearly established procedural due process rights by, after

allowing Lee a window of time to pursue opportunities in other departments, processing

the Department's recommendation and dismissing her from the Graduate School.

For academic dismissals such as this one where in the faculty's judgment

inadequate progress is being made toward degree completion, no hearing is required.

*Board of Curators of University of Missouri v. Horowitz,* 435 U.S. 78, 84-85 (1978).

Here, it is undisputed that the KSU Graduate School had always processed academic

dismissals in this manner, according to Dean Carol Shanklin and Dr. Guikema. Dr. Neill

and Dr. Guikema followed the procedure for academic dismissals as that procedure had

been followed in the past.  They had no knowledge that a different procedure was

required in Lee's case where she admittedly failed to have a major professor and failed to secure a new one. The KSU Graduate Handbook did not require a formal hearing in this situation. The Graduate School never had a hearing on this type of dismissal (dismissals for disciplinary reasons were handled by different offices and were not processed by the Graduate School and were subject to a different process).

Given Lee's failure to meet her burden under this prong of her two-part burden in overcoming Dr. Neill's and Dr. Guikema's qualified immunity, the judgment of the District Court may and can be affirmed on this basis alone.

### III.    Lee Received Sufficient Process For Her Academic Dismissal

As to the second prong of the qualified immunity test, in her Memorandum and Order, Judge Robinson found that Lee had failed to show any violation of her procedural due process rights with regard to her dismissal at KSU, whether this dismissal was considered academic or disciplinary. Mem. & Order filed 7/23/15 (Doc. 81), at 23-24, R. Vol. II, at 580-81. However, based upon the uncontroverted facts appearing on summary judgment, Judge Robinson found that Lee's dismissal for failure to have a major advisor was in fact an academic reason for dismissal. *Id.* Judge Robinson held that *Board of Curators of University of Missouri v. Horowitz,* 435 U.S. 78 (1978) controlled as to "the level of appropriate due process, as well as the importance of giving deference to the academic institution's evaluative decisions about its students." Mem. & Order filed 7/23/15 (Doc. 81), at 16, R. Vol. II at 573. Under *Horowitz,* which involved dismissal of

23

a medical student for failure to make sufficient progress, no hearing is required and sufficient due process is required if the student is informed of the faculty's dissatisfaction and the consequences thereof and the ultimate decision to dismiss the student is careful and deliberate. *Id.*, at 84-85.  The Supreme Court noted in *Horowitz* that this standard for academic dismissals was consistent with sixty years of court decisions, including this Court's decision in *Gaspar v. Bruton,* 513 F.2d 843, 851 (10th Cir. 1975), where this Court affirmed judgment against a nursing student bringing a procedural due process claim finding due process satisfied where the school had advised the student "with respect to such deficiencies in any form" and the consequences of such deficiencies. *Horowitz,* 435 U.S. at 87-88.  The District Court also noted this Court's decision in *Trotter v. Regents of University of New Mexico,* 219 F.3d 1179 (10th Cir. 2000), as on point herein this Court applied *Horowitz* to affirm the district court's grant of summary judgment to the university defendants on a procedural due process claim brought by a dismissed medical student, finding that *Horowitz* did not require a hearing and that due process was satisfied if the student has prior notice of the faculty's dissatisfaction and the decision to dismiss the student is careful and deliberate.  219 F.3d at 1184-85. As the District Court correctly held, *Horowitz* is directly on point here, supplies the clearly established law for purposes of the qualified immunity analysis, and compels judgment in Dr. Neill's and Dr. Guikema's favor.

Assuming, for the sake of argument, Lee had a protected property interest in continued enrollment in the Ph.D. program (which Defendants dispute)[4], there is no question as Judge Robinson correctly found that the process provided by Dr. Neill and Dr. Guikema met the *Horowitz* standards.  As Judge Robinson correctly found based upon the undisputed facts at summary judgment, many of which were based upon Lee's Responses to Requests for Admission, Lee was aware that she could not complete her dissertation and complete the degree without the supervision of a major professor.  Drs. Neill, Guikema and others reminded her of this.  Dr. Neill gave her deadlines to let him know if she had located another major professor.  As the District Court stated it, "Plaintiff was given notice of the deficiency – lack of a major professor – and the consequence, dismissal from the Statistics Department – and dismissal from the Graduate School if she failed to obtain a major professor in another graduate program." Mem. & Order filed 7/23/15 (Doc. 81), at 18, R. Vol. II at 575.  Lee failed to find another major professor and refused the option to seek another graduate program.

The District Court also found that the process employed was careful and deliberate, reciting the following facts which are supported by the uncontroverted facts set forth at summary judgment and appearing in the record herein.  Mem. & Order filed

---

[4] Neither Lee nor the District Court cited a Kansas statute creating a property interest in a graduate student's continued enrollment in a Ph.D. program.  If a property interest exists, it must be established by state law.  *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577 (1972). However, because of the multiple other grounds upon which the District Court's opinion can be affirmed, this issue is not necessary to this appeal and will not be further argued herein.

7/23/15 (Doc. 81), at 19, R. Vol. II at 576.  After Lee sought Dr. Wang's removal in the

Fall of 2011, Dr. Neill volunteered to serve as a co-major professor with Dr. Wang so

Lee could continue to work with Dr. Wang.  When Lee sought Dr. Wang's removal with

the March 2012 grievance, that grievance was approved and Lee was left needing a new

major professor.  The Graduate Student Progress Committee met and determined that Lee

was failing to make progress, due to her lack of a major professor.  Dr. Higgins reported

the Committee's finding to Dr. Neill on April 20.  Dr. Neill kept the faculty informed but

also urged Lee to keep him informed on her progress in locating another major professor.

After the April 27 deadline passed, Drs. Neill, Guikema and Crawford began urging Lee

to seek another graduate program.  On May 8, the Progress Committee recommended

Lee's dismissal, in which the Statistics Faculty concurred.  Dr. Neill communicated that

recommendation to the Graduate School.  Dr. Guikema gave Lee notice of the

recommendation and the impending dismissal but also gave her the opportunity to find

another graduate program at KSU.  When Lee advised the Graduate School that she had

decided not to transfer to another graduate program then, and only then, on May 31 was

she dismissed from the Graduate School.

The District Court also conducted the differentiated analysis required by qualified

immunity, setting forth the facts as to each defendant.  *Id.*, at 20, R. Vol. II, at 577.  The

District Court found that Dr. Neill: agreed to serve as a co-professor, removed himself as

co-major professor on the change form that Lee signed and approved, gave Lee notice

that to make progress she needed to find another major professor and gave her twenty-

two days to do so, continued to remind Lee of her responsibility and the deadline to find another major professor, did not preclude her from continuing to work on the topic she had worked on with Dr. Wang, asked for a formal decision from the Graduate Student Progress Committee and recommended dismissal from the Department based on the vote of the SPC.  Dr. Neill never acted unilaterally. *Id.*, at 20-21, R. Vol. II at 577-78.

As to Dr. Guikema, the District Court found that Dr. Guikema informed Lee that she needed to go to another department in the Graduate School, met with her on May 7 to discuss her options given her imminent dismissal from the Statistics Department, advised her that she would likely be dismissed from the Graduate School as the Statistics Department was going to recommend dismissal, and advised her on May 11 that the Department had recommended her dismissal but that he would give her six weeks to find another program.  Dr. Guikema did not act unilaterally.  *Id.*, at 21, R. Vol. II at 578.

The District Court found that neither Dr. Neill nor Dr. Guikema were involved in the CIRT process.  *Id.*, at 21-22, R. Vol. II, at 578-79.   The District Court found that the CIRT process resulted in no disciplinary action.  *Id.*, at 23, R. Vol. II, at 580.  The Court found that  "in every communication, including the formal recommendation and formal dismissal, Plaintiff's dismissal was premised on her failure to satisfactorily progress academically, because she had no major professor to supervise her dissertation work." *Id.*, at 23-24, R. Vol. II, at 580-81.

In the alternative, the District Court found that Lee had received sufficient due process even for a disciplinary dismissal.  *Id.*, at 24, R. Vol. II, at 581. For a disciplinary

dismissal, a student must "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* (citing *Goss v. Lopez*, 419 U.S. 565, 584 (1975)). The Court found that Lee was repeatedly given oral and written notice that she needed a major professor and that she could not progress without one. *Id.* Lee did not deny that she lacked a major professor and did not deny that she needed one. *Id.* The Court found that under the circumstances, there was no need for further process and since the CIRT ended with a finding of no disciplinary action, there was no need for further process on that basis. *Id.* The Court found that any consideration of the May 2 incident did not change the nature of the dismissal, which remained a dismissal for academic reasons. *Id.,* at 25, R. Vol. II, at 582.

The District Court's findings were supported by the facts of record and applicable law. Although not cited by the District Court, other authorities are also in accord. For example, *Mauriello v. University of Medicine and Dentistry,* 781 F.2d 46, 51 (3d Cir. 1986), *cert. denied,* 479 U.S. 818 (1986), bears similarities to this case. There, a graduate student brought a procedural and substantive due process claim against the university and its officials after she was dismissed. *Id.*, at 47. The student had disagreements and personality conflicts with her major advisor, who eventually withdrew. *Id.,* at 51-52. As the trial judge put it, "the ball was in the student's court" to find a new advisor, but she did not and eventually was dismissed. *Id.* The Circuit vacated the jury's judgment for the student, finding that the student's dismissal was academic and hence the informal faculty

evaluation she received was all that was necessary to satisfy due process.  More
specifically, the Circuit found that plaintiff was aware that her faculty advisor was going
to withdraw and that her continuance as a Ph.D. candidate was in jeopardy. *Id.*, at 51.  No
formal hearing or process was required. *Id.*

Here as the District Court correctly found, Lee had notice of the University's
requirements of  continued progress and the necessity of a major professor.  This was in
fact true from the very date of her admission to the Graduate School in 2006, as the
Graduate Handbook emphasized that graduate students are expected to *continue to make
progress* toward degree completion.  Similar and more specific requirements in this
regard were stated in the Department of Statistics Handbook, along with expectations
regarding time frames. The importance of the major professor was also emphasized in the
Statistics Department Handbook.  In the Fall of 2011, Dean Shanklin, Dr. Aistrup and Dr.
Neill all reiterated to Lee that if she discontinued working with Dr. Wang, as she was
seeking to do, that decision would have consequences in terms of her ability to make
progress toward her Ph.D.  Dr. Neill even spelled this out to her in the September 2011
"Options" Email, options which Lee confirmed she had received and understood.

After Lee's March 2012 grievance was approved granting her stated objective of
removing Dr. Wang from her supervisory committee and the paperwork signed by all
(Lee included) on April 4, 2012, Dr. Neill repeatedly restated to her what she admittedly
already  knew – that she needed to have a major professor to supervise her Ph.D. research
in order to make academic progress. As the District Court found, Dr. Neill  did not act

unilaterally but consulted with the Graduate Student Progress Committee and other members of the Statistics Department faculty before recommending Lee's dismissal from the Department when she admittedly failed to locate another major advisor after having been repeatedly given notice and additional time to complete this critical task.

For his part, Dr. Guikema made it crystal clear to Lee in the May 7, 2012 meeting that she was going to be dismissed from the Department of Statistics and that her only option was to seek another department if she wanted to remain in the Graduate School at KSU.  Dr. Guikema gave her extra time to try to obtain an advisor in another department. Only after she informed Dr. Guikema that it was her formal decision not to pursue those opportunities did he process the letter dismissing her from the Graduate School.

As the District Court correctly found, Dr. Neill's and Dr. Guikema's actions were "careful and deliberate," *Horowitz*, 435 U.S. at 85, and under *Horowitz,* Drs. Neill and Guikema are entitled to judgment as a matter of law.  Academic judgments such as a failure to make academic progress are not of the type courts are prone to second guess; "[c]ourts are particularly ill-equipped to evaluate academic performance." *Horowitz,* 435 U.S. at  92; *accord Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225-28 (1985); *see generally,* S. Milam & R. Marshall, "Impact of  Regents of the University of Michigan v. Ewing on Academic Dismissals from Graduate and Professional Schools," 13 J.C. & U.L. 335 (1987).

**IV.    Lee's Speculations Do Not Convert An Academic Dismissal Into A Disciplinary One; Lee Also Failed To Utilize The Grievance Process To Challenge Her Dismissal Or To Put The University On Notice That She Believed A Different Process Was Required**

Given the clear bar of *Horowitz* and the uncontested facts of record*,* Lee attempted in the District Court and again on appeal  to confuse the issue by arguing that her dismissal was based upon the May 2, 2012 CIRT process which was based upon a report of  her conduct at the Graduate School rather than for the stated and admittedly true reason of her failure to secure another major professor to supervise her dissertation research. As the District Court correctly found, Lee's argument is contrary to the face of the dismissal documents and the relevant material facts which are not subject to genuine dispute. Mem. & Order filed 7/23/15 (Doc. 81), at 23-24, R. Vol. II, at 580-81.

As indicated above, the Department's recommendation – based upon the Graduate Student Progress Committee's April 19 recommendation, discussed with the entire faculty more than once, and conveyed by Dr. Neill to the Graduate School on May 9 – was based upon failure to make progress based upon Lee's admitted lack of a major advisor, an academic reason.

Lee admits that she lacked a major professor. Without one, she could not make progress – a fact she admits.  After she filed the March 2012 grievance seeking Dr. Wang's removal as her major professor, Lee left herself without a major professor and admittedly did not succeed in convincing anyone else in the Statistics Department to serve in that position although even Lee admits that she had contacted every faculty

member in the Statistics Department about serving as her major advisor between April 11 and April 15 and was unsuccessful, <u>well before the CIRT process was even initiated in May</u> and well prior to Dr. Neill's May 3 or May 8 emails or his complained of suggestion on April 24, 2012 that faculty members with tenure would be the best choice for assuming this role. As Dr. Neill testified in his Declaration, Dr. Wang was the only faculty member whose research interests were in the area of Lee's chosen topic.  Since Lee refused to change topics, no other faculty member was able to assist her with this specialized and narrow area of statistics research which was peculiarly within Dr. Wang's expertise.  There was also the issue of Department policy as stated in the Handbook, which the faculty members revisited in Spring 2012,  providing that the research topic remains with the faculty member, in this case, Dr. Wang. Lee's refusal to change topics, not Dr. Neill's belated emails, made it difficult if  not impossible for another faculty member to assist her with her Ph.D. research.

Similarly, the process of Lee's dismissal for failure to make academic progress due to her admitted lack of a major professor was initiated well prior to the CIRT incident, including the Graduate Student Progress Committee's April 19 finding that Lee was one of two students not making academic progress.  The CIRT was irrelevant to that process which was already underway and continuing.

As the District Court found based upon Heather Reed's Declaration, the Critical Incident Response Team meeting resulted in a conclusion that Lee was <u>not</u> deemed dangerous and no disciplinary proceeding was warranted or instituted.  If it had been

instituted, a different process would have applied than the one used here.  As stated in the Graduate Handbook, "[n]on-academic conduct of graduate students is governed by the KSU Student Code of Conduct in the *Student Life* Handbook and the hearing procedures therein." Graduate Handbook, 2012-2013, Shanklin Exhibit A, at A-2, R. Vol. I, at 641. Under KSU's policies, a disciplinary dismissal is generally based upon one of 27 specified behaviors specified as misconduct in the Student Code of Conduct. As stated in the Shanklin Declaration at ¶ 14 (Doc. 68-1), R. Vol. I, at 584, a limited number of other policies may provide for a disciplinary dismissal, including Honor & Integrity violations, discrimination or sexual violence or violations of the Threat Management Policy, but those are not handled by the Graduate School and are not at issue here.  *See also,* Shanklin Exhibit A, at A-2, referring to non-academic conduct of graduate students, R. Vol. I, at 641. Neither the May 9 recommendation nor the May 31 dismissal letter cited to the Student Code of Conduct or alleged that Lee had committed one of those 27 acts for which discipline could be imposed.  Since the letters did not allege a violation of the Student Code of Conduct, the disciplinary procedure did not come into play on this dismissal and there was no reason for University officials to even consider that process. As Dean Carol Shanklin states in her Declaration at ¶ 14 (Doc. 68-1), R. Vol. I, at 584, the Graduate School does not even handle disciplinary dismissals, which are handled by other offices.

Whether a dismissal is academic or disciplinary should be determined in the first instance by reference to the institution's policies. This creates a bright line rule on the

33

subject.  These policies are published and made known to the students, as was the case

here with Lee and the Graduate School Handbook which was made known to her upon

her admission in 2006.  These policies are what university officials consult to govern

their actions and procedures.  The policies provide some basis for review.  With a policy,

everyone involved – students and university officials – know which rules apply and what

procedures are to be accorded.  To recharacterize a dismissal after the fact serves no

one's interests.

Here, the Student Code of Conduct provides for disciplinary dismissals. Lee's

dismissal was never referred to as disciplinary and never brought under this Code or its

procedures, which clearly do not apply. *Cf. Brown v. University of Kansas*, 16 F. Supp.

3d 1275, 1289 (D. Kan. 2014), *aff'd,* 559 Fed. Appx. 833 (10th Cir. 2015) (finding KU's

dismissal of a law student for making false statements on the application to be

disciplinary, in part because Plaintiff alleged that this is how KU had characterized the

matter to the student).  This was not a "misconduct" case, but a failure to make progress

case, an academic judgment rather than a rule violation.

Alternatively, as the District Court held, the process provided to Lee here was

sufficient even under disciplinary standards.  All that is required is that the student be

given oral or written notice of the charges and, if he or she denies them, an explanation of

the evidence the authorities have and an opportunity to present his or her side of the

story. *Horowitz*, 435 U.S. at 86 (citing *Goss v. Lopez*, 419 U.S. 565, 584 (1975)).  Here as

the District Court found, Lee was repeatedly given notice that she needed to find another

major professor because she could not progress academically without one.  For her part, Lee did not deny that she needed a major professor or that she lacked one.  Thus, even under the process for disciplinary dismissals, there was no need for further process in this instance.  *Cf. Brown v. University of Kansas*, 599 Fed. Appx. 833, 837 (10th Cir. 2015) (reviewing and affirming the district court's grant of summary judgment to the university on a law student's disciplinary dismissal finding that the benefit of any additional or more formal procedures "would have been minimal in light of the undisputed facts.").

As the District Court correctly found that, on the undisputed facts of record, Lee had access to additional due process procedures at KSU had she filed a grievance in the period between her grievance seeking Dr. Wang's removal and her dismissal, but failed to avail herself of this procedure.  Although Lee knew about the grievance process, she did not file any formal grievance after the March 18, 2012 grievance.  If she truly believed her dismissal was retaliatory as opposed to academic, she could have and should have filed a formal grievance and caused a panoply of other process.  She did not. Plaintiff's Response to Defendant's First Request for Admissions Nos. 12-13 (Doc. 68-20), R. Vol. I, at 717.  By filing this grievance, Lee could have put the University on notice that she believed her dismissal was disciplinary rather than academic and made her argument that a different process, including a hearing, was required.  However having failed to do so, a due process claim cannot be maintained as a matter of law. *See, e.g., Hardman v. Johnson County Community College,* No. 13-2535-JTM, 2014 WL 1400668, at ** 4-5  (D. Kan. April 10, 2014).  The question is not a matter of exhaustion, but rather

whether the process that was offered by the University and "abandoned by" the plaintiff

was constitutionally adequate. *Id.*

Where an avenue of review is available and the plaintiff fails to utilize it, he or she

cannot maintain a procedural due process claim. *See, e.g., Alexander v. Kennedy-King

College,* No. 88 C 2117, 1990 WL 179691, *6 (N.D. Ill. Nov. 2, 1990) (where plaintiff

student failed to contact the counseling department as directed in a denial letter, the

student had no procedural due process claim, citing numerous cases including *Kremer v.

Chemical Const. Corp.*, 456 U.S. 461, 485 (1982) ("The fact that Mr. Kremer failed to

avail  himself  of the full procedures provided by state law does not constitute a sign of

their inadequacy.")).

For example, in *Alexander v. Kennedy-King College,* the Plaintiff argued that

procedural due process was violated because he did not receive a hearing or a notice of

hearing when his application for graduation was denied by a faculty committee and

Department chairperson. *Id.*, at  * 3, * 6.  The Court cited *Horowitz* and concluded that no

hearing was required on an academic dismissal and that the procedural requirements "are

so minimal that in only extremely rare situations would an educational institution's

actions be found to violate the Fourteenth Amendment procedural due process right." *Id.*,

at * 5 (quoting *Amelunxen v. University of Puerto Rico,* 637 F. Supp. 426, 431 (D. Puerto

Rico 1986), *aff'd mem.*, 815 F.2d 691 (3d Cir. 1987)).  The Court found that not only was

no hearing required (particularly where the issue was sharply focused), the Plaintiff failed

to avail himself of the procedure available to him where the denial letter told him, "if you

36

disagree with the results of this review, please contact the counseling department – room 225E….” *Id.*, at * 3, **5-7.  The Court found that due process was satisfied. *Id.*, at * 7. As this Court has recognized, a plaintiff does not get to pick and choose his or her process; the requirements of due process is satisfied as long as some process is available. *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 325 (10th Cir. 1984) (“Although the right to be heard is an integral part of due process, an individual entitled to such progress is not entitled to dictate to the court the precise manner in which he is to be heard.”)).

In addition here, as the District Court found, Lee had additional procedure available to her through the grievance process as set forth in Appendix A to the Graduate Student Handbook (which Lee admittedly did not employ), eliminating any procedural due process claim in this instance.  *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). In this case, the Graduate School had always processed academic dismissals in this manner, according to Dean Carol Shanklin and Dr. Guikema. Dr. Neill and Dr. Guikema followed the procedure for academic dismissals as that procedure had been followed in the past and hence, are entitled to qualified immunity in any event.

## CONCLUSION

As the District Court correctly found, Grace Lee “utterly failed” to meet her burden of showing that her constitutional rights were violated or of overcoming Dr. Neill’s or Dr. Guikema’s claim of qualified immunity.  The District Court’s judgment in favor of Defendants Dr. James W. Neill and Dr. James A. Guikema must be affirmed on appeal.

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
DEREK SCHMIDT


s/ M.J. Willoughby
M.J. Willoughby, KS Sup. Ct. No. 14059
Assistant Attorney General
Memorial Bldg., 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Tel:  (785) 296-2215; Fax:  (785) 291-3767
Email:  MJ.Willoughby@ag.ks.gov
Attorney for Appellees
Dr. James W. Neill and Dr. James A. Guikema

## CERTFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(a)(7), I certify that the brief complies with the type-volume limitations stated in the above-cited rule, specifically, the brief contains 11.018 words,  as determined by Microsoft WORD 2007 word processing system, including parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  I certify that this information is true and correct to the best of my knowledge and belief formed after reasonable inquiry.

## CERTIFICATE OF PRIVACY REDACTIONS

As required by Fed. R. App. P. 25(a)(5) and 10th Cir. R. 25.5, the undersigned attorney certifies that all required privacy redactions have been made.

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing BRIEF OF APPELLEES as submitted in digital form is an exact copy of the written document filed with the Clerk.

## CERTIFICATE OF SCANNING

I hereby certify that the digital form of the foregoing BRIEF OF APPELLEES has been scanned for viruses using the Sophos Endpoint Security and Control updated daily, and, according to the program, is free of viruses.

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rule of Appellate Procedure 25(d), I hereby certify that on this 4th day of January, 2016, the foregoing BRIEF OF APPELLEES was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that a copy was also sent to Grace Lee, Plaintiff pro se, at gracelee695@gmail.com. Copies were also served on Ms. Lee by means of U.S. mail, postage prepaid, addressed to: Grace Lee, 198 Mt. Vernon St., S1, Malden, MA  02148. I also certify that I caused seven paper copies to be delivered by Federal Express to the Clerk's Office.


/s/M.J. Willoughby
M.J. Willoughby
Assistant Attorney General